UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
In re:

ALLOU DISTRIBUTORS, INC., *et al.*,

                          Debtors.

                Chapter 7
                Case No. 03-82321-ess
                (Substantively Consolidated)

----------------------------------------------------------------x
KENNETH P. SILVERMAN, as Chapter 7 Trustee
of ALLOU DISTRIBUTORS, INC., *et al.*, and
CONGRESS FINANCIAL CORPORATION,

                Adv. Pro. No. 03-08482-ess

                          Plaintiffs,

                 -against-

UNITED TALMUDICAL ACADEMY TORAH
VYIRAH, INC. a/k/a UNITED TALMUDICAL
ACADEMY a/k/a UNITED T.A., TALMUD
TORAH D'RABEINU YOEL S'FARDIM, INC.,
AFRICAN MARKET TRADING, INC. and
ARTHUR MEISELS a/k/a USHER MEISELS,

                         Defendants.
----------------------------------------------------------------x

**MEMORANDUM DECISION ON MOTION FOR PARTIAL SUMMARY JUDGMENT
OF DEFENDANT UNITED TALMUDICAL ACADEMY TORAH VYIRAH, INC.**

Appearances:

OTTERBOURG, STEINDLER,
HOUSTON & ROSEN, P.C.
230 Park Avenue
New York, New York 10169
 *Attorneys for Congress Financial
 Corporation k/n/a Wells Fargo Bank, N.A.*

SILVERMANACAMPORA LLP
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
 *Attorneys for Kenneth P. Silverman, Esq., as
 Chapter 7 Trustee of Allou Distributors,
 Inc., et al.*

SCHLAM STONE & DOLAN LLP
26 Broadway
New York, New York 10004
 *Attorneys for United Talmudical Academy
 Torah Vyirah, Inc.*

**HONORABLE ELIZABETH S. STONG**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the motion of defendant United Talmudical Academy Torah Vyirah, Inc. ("UTA") for partial summary judgment under Bankruptcy Rule 7056 and Federal Rule of Civil Procedure 56 on the claims asserted against it in the complaint dated January 20, 2006, filed by Congress Financial Corporation, now known as Wells Fargo Bank, N.A. ("Congress"), and Kenneth P. Silverman, as Chapter 7 trustee (the "Trustee") of Allou Distributors, Inc. and other entities ("Allou").  This motion arises in one of many adversary proceedings brought in connection with the fraud committed by Allou's principals, and the involuntary and voluntary bankruptcy filings that followed.

Summary judgment is a useful tool to facilitate the progress of a dispute toward a determination on the merits.  As recently-amended Federal Rule of Civil Procedure 56 recognizes, it requires a court to enter judgment, in whole or in part, where there is no genuine dispute as to any material fact and a party is entitled to prevail as a matter of law.  In complex matters, it promotes the just, speedy, and inexpensive resolution of litigation by eliminating the need for a trial on all or part of a claim.

Some issues are especially well suited for determination on summary judgment, including those where a necessary element of a claim such as the receipt of a payment can be determined from the record at the close of discovery.  But other issues, including knowledge and intent, and issues that turn on credibility determinations, are less well suited for summary judgment because they require the trier of fact to probe into the minds of the actors and may need to be decided after a trial.

This complex action presents both kinds of issues.  It arises from a massive fraud perpetrated by Allou's senior officers, and the Plaintiffs' claims arise from almost $30 million in

scores of transactions over a six-year period among Allou, UTA, and other entities. Where UTA shows that there is no genuine dispute as to whether it received a transfer, and the Plaintiffs do not come forward with evidence sufficient to create a genuine dispute, then partial summary judgment should issue. But where a genuine issue is raised by questions of knowledge and intent, and those matters are material to the determination of the claim, then the claim should proceed to trial.

The Plaintiffs bring Claims One, Two, and Three under theories of aiding and abetting breach of fiduciary duty, aiding and abetting fraud, and civil conspiracy,[1] based on UTA's alleged participation in the breach of fiduciary duty and fraud perpetrated by Allou's former management. The Trustee brings Claims Four through Nine under New York's Debtor and Creditor Law ("DCL") Sections 276, 273, 274, and 275 and Bankruptcy Code Sections 548(a)(1)(A) and (B) to recover funds transferred to UTA by Allou, its principals, and affiliates. Claim Four also seeks attorneys' fees under DCL Section 276-a, based on UTA's actual intent to defraud Allou's creditors. Congress brings Claims Eighteen, Nineteen, and Twenty under theories of unjust enrichment, money had and received, and conversion to recover funds transferred to UTA that constitute Congress' collateral.

UTA argues that summary judgment should be granted on the aiding and abetting claims because the Plaintiffs lack evidence sufficient to show actual knowledge and substantial assistance, which are essential elements of those claims. Similarly, UTA contends that it is entitled to judgment on the Trustee's demand for attorneys' fees under DCL § 276-a because that

---

[1] Claim Three is titled "Fraud and Conspiracy to Commit Fraud." UTA argues, and the Plaintiffs do not dispute, that it should be treated as a claim for civil conspiracy.

statute requires a showing of actual intent that the Trustee cannot make.  UTA seeks judgment

on the civil conspiracy claim on grounds that it is duplicative of the aiding and abetting claims.

And UTA argues that partial summary judgment should be granted on the remaining claims

under various theories.  The Plaintiffs respond that genuine disputes as to material facts preclude

the entry of summary judgment.

## **Jurisdiction**

This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334(b) and

157(b)(1).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(H).  The following are

the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure

52, made applicable here by Bankruptcy Rule 7052.

## **Procedural History**

### The Complaint

This adversary proceeding was commenced on October 29, 2003, when the Plaintiffs

filed a complaint against UTA.  UTA made two motions to dismiss which were heard and

determined by the Court, and on January 23, 2006, the Trustee and Congress filed a third

amended complaint (the "Complaint").

The Plaintiffs allege that UTA and certain of its leadership, including Arthur Meisels,

knew of and actively participated in the massive fraud perpetrated by Allou's former

management.  The Plaintiffs also allege that UTA, Mr. Meisels, and entities under his control

including African Market Trading, Inc. ("AMT"), facilitated the transfer of huge sums to further

the fraud, and that:

> The funds Congress . . . advanced to Allou were transferred to entities either
> controlled by the Jacobs [] such as [Talmud Torah D'Rabenu Yoel L'Sfardim,

3

> Inc. ("TTDY")] or to entities within their sphere of influence such as AMT and
> UTA who agreed to keep or launder these funds to perpetuate the fraudulent
> scheme and for purposes unrelated to Allou's business.

Compl. ¶ 1.

The Plaintiffs allege that these activities advanced not only the personal financial

interests of the Jacobs, but also the common interests of the Jacobs and Mr. Meisels in the hotly-

contested succession dispute within the Satmar Hasidic community.  As the Complaint states:

> [T]here is a succession dispute involving competing supporters of two sons of
> Grand Rebbe Moshe Teitelbaum.  The Grand Rebbe is believed to be close to
> ninety-years old, and his successor has not yet been designated.  The Jacobs-
> Meisels Faction supports Zalman Teitelbaum, while the competing faction
> supports Aaron Teitelbaum.  In order to curry favor for its choice, the Jacobs-
> Meisels Faction looted Allou by transferring substantial sums to UTA, TTDY and
> others, with the active participation of Meisels (the President and CEO of UTA)
> and AMT (a Meisels-controlled entity).

Compl. ¶ 2.

The Plaintiffs allege that "[e]ach Defendant, as a recipient and/or transferor of funds from

Allou, aided and abetted and conspired with the Jacobs[] in perpetuating a fraudulent scheme at

Allou . . . ."  Compl. ¶ 3.  The Plaintiffs also allege that the defendants conspired to perpetrate

the fraud at Allou by:

> (a) allowing Allou to "park" money with UTA and AMT which was then
> transferred for the benefit of the conspirators; (b) deepening UTA's complicity in
> a scheme of check kiting; (c) facilitating UTA's receipt of millions of dollars
> from Allou with no legitimate business purpose; (d) [allowing] Meisels and AMT
> [to] act[] as "middlemen" in the laundering of money; and (e) transferring
> hundreds of thousands of dollars . . . to TTDY, an entity controlled by Victor
> Jacobs that transfers hundreds of thousands of dollars to Israel[,] and at least
> $50,000 to T&J Associates ("TJ"), a "real estate holding company" owned by the
> Jacobs[].

Compl. ¶ 3.  And the Plaintiffs allege that UTA and the other "Defendants had a unique

relationship with Victor Jacobs, such that they knew of Victor Jacobs' role and responsibilities

4

as chairman of publicly-traded Allou and each conspired with Victor Jacobs to take advantage of that relationship to aid and abet" the fiduciary breach and fraud at Allou, and to support the Jacobs-Meisels faction.  Compl. ¶ 4.  The alleged relationships include that Mr. Meisels is President and CEO of UTA and a signatory on its bank accounts, that the Meisels family and the Jacobs are related through a recently arranged marriage, and that Victor Jacobs' wife is related to Mr. Meisels.  The Plaintiffs allege that "[a]s a result of the fraudulent scheme, Congress has incurred damages in excess of $150,000,000, and Allou has been damaged by more than $200,000,000."  Compl. ¶ 1.

On February 22, 2006, UTA answered the Complaint, and on March 14, 2006, UTA amended its answer.  UTA denies that it is liable for any amounts and asserts certain affirmative defenses, including under DCL Section 278 and Bankruptcy Code Section 548(c) and the applicable statutes of limitations.

On June 1, 2009, the parties submitted a Joint Pre-Trial Statement ("JPTS") setting forth the material facts that are not in dispute, including stipulations as to the terms of many of the transfers at issue, and their respective positions on many disputed facts.

On September 11, 2009, UTA filed this motion for partial summary judgment, together with a memorandum of law ("UTA Mem."), and a statement of material facts not in dispute.  UTA's motion is supported by the affirmation of UTA's counsel Thomas A. Kissane (the "Kissane Decl."), and the declaration of UTA employee Helen Greenwald.

On October 23, 2009, the Plaintiffs filed a memorandum of law in opposition to UTA's motion ("Pltfs' Opp.").  The Plaintiffs' Opposition is supported by the declaration of Congress' counsel Richard G. Haddad (the "Haddad Decl.") and the affirmation of Congress' consultant

Timothy M. Puopolo.  The Plaintiffs also filed a statement of contested facts pursuant to Local Rule 7056-1.

On December 4, 2009, UTA filed a reply memorandum in further support of its motion ("UTA Reply"), the reply declarations of Mr. Kissane and UTA employee Isaac Mandel ("Mandel Reply Decl."), and a reply to the Plaintiffs' Statement and Response.

On August 4, 2010, the Court heard argument from counsel for UTA, the Trustee, and Congress, allowed the parties to supplement the record, and reserved decision.  On August 6, 2010, UTA and the Plaintiffs filed supplemental submissions.

## Background

The following findings of fact are drawn from the extensive summary judgment record and the Court's docket, and are construed in the light most favorable to the Plaintiffs as the nonmoving parties.

### The Debtors' Bankruptcy Cases

On April 9, 2003, involuntary Chapter 11 petitions were filed against Allou Distributors, Inc. ("ADI"), and three of its affiliates, M. Sobol, Inc., Direct Fragrances, Inc., and Stanford Personal Care, Inc. (together, the "Original Debtors"), by Congress, Citibank, N.A., and LaSalle Business Credit, LLC.  The Original Debtors consented to the entry of orders for relief under Chapter 11, and on April 10, 2003, the Court issued orders for relief in these Chapter 11 cases. The Original Debtors are wholly-owned subsidiaries of Allou Health Care, Inc. ("AHI"), a publicly-traded Delaware corporation.  On April 18, 2003, Congress, Citibank, and LaSalle filed an involuntary Chapter 11 petition against AHI, and on July 14, 2003, the Court entered a consensual order for relief.

6

On April 18, 2003, Congress, Citibank, and LaSalle filed involuntary Chapter 11 petitions against two of ADI's six subsidiaries, Trans World Grocers, Inc., and Rona Beauty Supplies, Inc. (the "Subsequent Debtors").  On May 1, 2003, the Court entered orders for relief in these cases.

On April 25, 2003, ADI's four remaining subsidiaries, Core Marketing, Inc., HBA Distributors, Inc., HBA National Sales Corp., and Pastel Cosmetic & Beauty Aids, Inc. (the "Voluntary Debtors") filed voluntary Chapter 11 petitions.[2]

By Order dated September 16, 2003, the Debtors' Chapter 11 cases were converted to cases under Chapter 7.  Kenneth P. Silverman was appointed as the Chapter 7 trustee.  The Debtors' cases were substantively consolidated by Order dated December 22, 2003.

The Defendant UTA

UTA is a not-for-profit corporation under the New York Religious Corporations Law, operating as a religious school with principal offices in Williamsburg, Brooklyn.  It was founded in 1949 as the educational arm of the Satmar Hasidic community, and has approximately 7,500 students from pre-kindergarten through grade thirteen.  To meet its operating expenses, UTA solicits and accepts donations and interest-free loans, and holds an annual fundraising dinner.

Congress and the Loans to Allou

Congress was engaged in the business of commercial finance.  Pursuant to a Loan and Security Agreement dated September 4, 2001, and certain related agreements, Congress, as lender and as agent and co-arranger for other lenders, made loans and other advances and

---

[2]  AHI, the Original Debtors, the Subsequent Debtors, and the Voluntary Debtors are referred to as the "Debtors."

7

provided financial accommodations to Allou of up to $200 million on a revolving basis.  Under

the Loan and Security Agreement, Allou could borrow funds up to a limit of 85 percent of

eligible accounts receivable and 50 percent of eligible inventory.  As of the filing of the Allou

bankruptcy petitions, Allou owed Congress approximately $178 million under the Loan and

Security Agreement and related agreements and guarantees.

Allou's Principals and the Fraudulent Scheme

Victor Jacobs and his sons Herman Jacobs and Jacob Jacobs were controlling

shareholders of Allou.  Allou's filings with the Securities and Exchange Commission show that

the Jacobs controlled approximately 61 percent of Allou's stock.  The Jacobs served as officers

and directors of Allou, with Victor as chairman, Herman as chief executive officer, and Jacob as

executive vice president.  The Jacobs guaranteed up to $10 million of Allou's obligations to

Congress and other lenders.

From the early 1990s through 2003, the Jacobs and others orchestrated and participated

in a fraudulent scheme designed to misrepresent Allou's financial condition and to increase the

funds available under the Congress line of credit.  As part of this scheme, Allou reported inflated

inventory and false accounts receivable to its lenders, and the Jacobs transferred funds to entities

that they controlled to pay the false accounts receivable.  These transfers were recorded on

Allou's books as inventory purchases.  The Jacobs-controlled companies then transferred these

funds back to Allou, and Allou recorded the transfers on its books as payments.  Allou

transferred hundreds of millions of dollars of the funds advanced by Congress to other

companies owned or controlled by the Jacobs.

On June 9, 2004, Victor, Herman, and Jacob Jacobs were indicted on federal charges

including bank fraud, violations of SEC rules and regulations, and bribery of a public official. On July 31, 2007, Herman Jacobs was sentenced to fifteen years of incarceration and three years of supervised release, and was ordered to pay more than $176 million in restitution. The next day, Jacob Jacobs was sentenced to seven years of incarceration and three years of supervised release, and was ordered to pay $30 million in restitution. Victor Jacobs passed away prior to the disposition of the criminal complaint and indictment against him.

<u>Victor Jacobs' Relationship with UTA and Arthur Meisels</u>

In 1998, Victor Jacobs began to attend UTA board meetings. *See* Haddad Decl. Exh. 39 (Glanz. Tr. 16-17). Rabbi Lieb Glanz, the former executive director of UTA, testified that sometime in the 1990s, Victor Jacobs became a guarantor of UTA's line of credit with Chase Manhattan Bank ("Chase"), and also personally guaranteed certain mortgages on UTA's behalf. For purposes of this motion, UTA acknowledges that Victor Jacobs was instrumental in having Mr. Meisels serve in a position of authority at UTA and on UTA's board of directors. Mr. Meisels testified that he served on UTA's board from 1999 until December 2004. Mr. Meisels' company AMT was also formed in 1999. And Mr. Meisels testified that his father-in-law is the brother of Victor Jacobs' mother-in-law.

Victor Jacobs and Mr. Meisels supported Zalman Teitelbaum in the disputed succession to Grand Rebbe of the Satmar community. *See, e.g.*, Haddad Decl. Exh. 39 (Glanz Tr. 21-22). The nature and impact of this dispute have been chronicled in several court proceedings. As one court notes:

> The polarization has so insidiously divided the two camps to the point that they each dispute the other side's legitimacy to be identified as true Satmar Chasidim. Control [] of the Congregations' synagogues, cemetery, assets, charitable, educational and religious institutions and even its corporate name has been hotly

contested both in and out of the judicial forum.

*Appl. of Congregation Yetev Lev D'Satmar, Inc. v. Kahan*, 5 Misc. 3d 1023(A), at *3-4 (N.Y. Sup. Ct. Kings Co. 2004).

<u>The Direct and Indirect Transfers Among Allou, UTA, and Others</u>

The parties stipulate that some 147 transfers took place among Allou, UTA, and others over the six years from February 1997 to March 2003. They range in size from $250 to $3.1 million, and in the aggregate they exceed $29.8 million. This includes 57 transfers to UTA from Allou and other entities, ranging in size from $250 to $300,000 and totaling more than $6 million. These direct and indirect transfers among Allou, UTA, and other entities lend support to the Plaintiffs' aiding and abetting and conspiracy claims and contribute to the damages claimed in the Trustee's fraudulent transfer claims, subject to the applicable statutes of limitations. And the transfers that occurred after September 4, 2001, the date of the Loan and Security Agreement, form the basis of Congress' damages in its unjust enrichment, money had and received, and conversion claims.

UTA argues that these transfers arise from donations and short-term, interest-free loans made in a manner consistent with the practices of the Satmar and Orthodox Jewish communities. And UTA argues that it entered into these transfers because it was in constant need of funds to meet its operating expenses.

The Plaintiffs respond that these transfers are suspicious for many reasons. They note that there were scores of these transfers and argue that they served no business purpose. They argue that the transfers are questionable because they involve individuals at Allou and affiliated entities who were involved in the fraud and fiduciary breach at Allou. The Plaintiffs also point

10

to questionable circumstances surrounding the transfers, including the lack of written documentation supporting the transfers, the absence of interest charges, the short-term duration and "round-trip" nature of the transactions, the use of intermediary entities to transfer funds from Allou to UTA, and UTA's repayment of funds to a different entity than the entity from which the funds were received.

### *Direct Transfers from Allou to UTA*

The Plaintiffs allege that Allou made 27 direct transfers to UTA between February 1997 and December 2002, totaling $688,350.  The Plaintiffs and UTA stipulate to the date, amount, and method of transfer of sixteen of these transfers, totaling $656,450.  Nine of these transfers were recorded on Allou's books as donations, five were recorded as loan-and-exchange or "L&E" transactions, one was recorded as "Officer 1099," and one was recorded as accounts payable.  Of the eleven transfers not stipulated to, one was recorded on Allou's books as "Bank fees," and ten were recorded as donations.  JPTS Exh. A.

The $300,000 Round-Trip Transaction  On May 3, 2002, by check number 111737, Allou transferred $300,000 to UTA.  That check was signed by Victor Jacobs and cleared on May 7, 2002.  It was deposited into UTA's account at Signature Bank.  The Plaintiffs claim that the next day, UTA issued a check signed by Mr. Meisels from Signature Bank to Allou for $300,000. The Plaintiffs contend that UTA did not use the Signature Bank account for its ordinary day-to-day operations.  These transfers were booked to the loan-and-exchange accounts of UTA and Allou.

UTA argues that because the transfers were recorded as loan-and-exchange transactions on Allou's books, they could not have had the effect of improperly inflating Allou's inventory or

receivables.  The parties stipulate that UTA's check to Allou did not clear until May 10, 2002.

And UTA contends that the clearance dates of these checks gave UTA access to the funds for

more than two business days, which is consistent with UTA's history of short-term cash needs

and the lending practices of the Satmar and Orthodox Jewish communities.

The $100,000 March Transfer  On March 2, 2001, by check number 10586, Allou

transferred $100,000 to UTA.  That check was signed by Victor Jacobs.  The parties stipulate

that the transfer was booked as a loan-and-exchange transaction by Allou and as a donation by

UTA.  The Plaintiffs contend that the transfer served no business purpose.  And the Plaintiffs

argue that UTA's explanation – that this was a donation for the annual fundraising dinner in

December – is not credible, because the payment was made in March, several months after the

dinner occurred.

UTA argues that this transfer was recorded as a donation on its books, and that it issued a

receipt to that effect.  UTA also notes that in view of the importance of the annual dinner, it is

not unusual for a donation to be made in March.

The $100,000 Transfer to UTA and TTDY  Victor Jacobs controlled TTDY.  *See* JPTS at

13.  He was a signatory on a Fleet Bank account in TTDY's name, and he signed each check

from Allou to TTDY by hand.  The parties agree that "the books of Allou were manipulated to

make it appear that certain of the transfers to TTDY were in payment of invoices of Tereza

Merchandising and Cambridge Mercantile, other entities implicated in the fraud [at Allou]."

JPTS at 13.

On June 5, 2001, by check number 10804, Allou transferred $100,000 to UTA.  That

check was signed by Victor Jacobs and deposited into UTA's account at Chase.  On November

12

15, 2001, Mr. Meisels signed a check for $100,000 drawn from UTA's Chase account and made

out to TTDY.  The Plaintiffs contend that Mr. Meisels issued the check to TTDY at the direction

of Victor Jacobs.  The parties stipulate that Allou and UTA each recorded the transfer as a loan-

and-exchange transaction.  The Plaintiffs also argue that UTA cannot show a business reason

why it paid funds received from Allou to another entity.  And the Plaintiffs contend that sending

this payment to TTDY achieved two goals of the alleged Jacobs-Meisels faction, that is,

removing cash from Allou and furthering the agenda of the faction.

UTA argues that it recorded this transaction as the repayment of a loan, and that it was

not unusual.  UTA also notes that witnesses testified that Solomon Sander, who was UTA's

contact with Victor Jacobs, directed that the funds be paid to TTDY, not to Allou.[3]  And UTA

contends that "[r]epayment of a donor's loan to a third party designated by the donor is

consistent with long-standing lending practices of the Satmar and Orthodox Jewish communities

. . . ."  JPTS at 60.

The Cambridge Mercantile Transfer  Allou wired $100,000 to UTA on July 1, 1999.

This transfer was listed on Allou's books and records as "payment of an account payable" due to

"Cambridge Mercantile Corp." in Toronto, Canada.  Haddad Decl. Exh. 6.  UTA booked the

transfer as a loan-and-exchange.  The Plaintiffs argue:

> UTA knew that there was no legitimate basis for it to receive or keep the money
> earmarked for "Cambridge."  Instead, this "Cambridge" payable had to be made
> to appear in Allou's books as actually having been paid, so Victor and his cohort
> Meisels agreed to transfer the money to UTA to mask the illegitimate payable and
> to advance the interests of the Jacobs-Meisels Faction.

---

[3]  Mr. Sander was not deposed and passed away in 2006.  Several witnesses testified that
Mr. Sander was responsible for obtaining loans to meet UTA's short-term cash needs and served
as UTA's contact with Victor Jacobs.

JPTS at 61.

UTA contends that it had no knowledge of or control over how Allou recorded transactions, and could not know whether Allou recorded the transfer as paid to Cambridge. UTA also notes that it returned these funds on September 15, 1999, by making a $100,000 payment to TTDY.

### *Direct Transfers from UTA to Allou*

The Plaintiffs allege that between July 29, 1997, and May 10, 2002, UTA made seven transfers to Allou, totaling $443,120.06. The parties stipulate to the terms of three of these transfers, totaling $380,000, but not to the remaining four transfers, totaling $63,120.06. Allou recorded each of these transfers in its loan-and-exchange accounts, and the three stipulated transfers were likewise recorded as loan-and-exchange transactions by UTA.

### *Indirect Transfers Among Allou, UTA, and Other Entities*

The Plaintiffs contend that between August 1997 and March 2003, UTA indirectly received 53 transfers from Allou through certain other entities, totaling $5,713,230. UTA denies that it received twelve of these transfers, totaling $276,380. The parties stipulate that UTA received 41 of the transfers, but do not agree that all of the funds transferred originated at Allou. The stipulated transfers were made by Impax, Crystal Clear, TTDY, Tereza, G. Bauer, Spocan Equities, Evergreen Warehousing, A&M Enterprises, and AMT.

Transfers Involving Tereza  The parties stipulate that on May 23, 2000, Tereza transferred $100,000 to UTA. The Plaintiffs argue that in the same month, Allou transferred $850,000 to Tereza. UTA disputes that the funds transferred to it originated at Allou. The Plaintiffs also allege that Tereza made a $5,000 transfer to UTA. But UTA denies receiving this

transfer.  The Plaintiffs contend that between January 1997 and April 2003, Tereza and its affiliates received payments from Allou totaling $35,131,768.  The Plaintiffs also argue that most of these transfers correspond to invoices deemed "fake" by the Trustee's forensic accountant.  Pltfs' Opp. at 42.

<u>Transfers Involving Crystal Clear</u>  Crystal Clear is in the business of importing glassware and crystal lamps.  It was owned and run by Rabbi Leibish Lefkowitz until his death in August 1998.  For many years, he served as president and a board member of UTA.  Abraham Lefkowitz took control of Crystal Clear in August 1998, after his father died.  Apart from modest sales to Allou or Victor Jacobs, Crystal Clear did not engage in business with Allou or Victor Jacobs.

The parties stipulate that from October 1997 to January 2002, Allou made thirteen transfers to Crystal Clear, totaling $2,564,342.  Eight of the transfers were recorded by Allou as loan-and-exchange transactions, and five others were recorded as accounts payable transactions. Two of the transfers were designated in Allou's books as payments to Olbex and Whitting Inc., Ltd., but the wire transfer and check for these transactions were directed to Crystal Clear.  UTA contends that the Olbex and Whitting transactions do not relate to UTA.

The parties stipulate that from August 1997 to June 2000, Crystal Clear made eighteen transfers to UTA, totaling $3.4 million.  The Plaintiffs claim that Crystal Clear made two additional transfers to UTA in January 2000 and January 2002, totaling $224,630.  But UTA denies receiving these transfers.  The parties stipulate to the terms of 25 transfers from UTA to Crystal Clear between September 1997 and July 2002, totaling $4,611,109.  And the parties further stipulate to the terms of eight transfers from Crystal Clear to Allou from December 1997 to June 2000, totaling $1.9 million.

15

The Plaintiffs argue that there was no business justification for these transfers. And the Plaintiffs contend that the record shows that the funds transferred from Allou to Crystal Clear were destined for UTA.

UTA argues that the manner in which it received funds from Crystal Clear was consistent with the long-standing lending practices of the Satmar and Orthodox Jewish communities. According to UTA, Rabbi Lefkowitz agreed to act as an intermediary on certain loans from Allou to UTA in order to induce Victor Jacobs to make those loans, and that after Rabbi Lefkowitz's death, Abraham Lefkowitz continued those lending practices.

<u>Transfers Involving Impax</u>  Impax was controlled by the Jacobs. The parties stipulate to the terms of eighteen transfers from Allou to Impax between November 2001 and December 2002, totaling $10,509,900. Allou recorded these transfers as accounts payable. The parties also stipulate to the terms of nine transfers from Impax to UTA between November 2001 and December 2002, totaling $1,104,650. And the parties stipulate to the terms of five transfers from UTA to Impax from January 2002 to February 2003, totaling $1,050,000. The Plaintiffs claim that Impax made four additional transfers to UTA between December 2001 and August 2002, totaling $28,250.

The Plaintiffs argue that there was no legitimate business purpose for these transfers, and that Impax was controlled by the Jacobs and used to perpetrate the fraud at Allou. The Plaintiffs also contend that Impax's sources of funds were Allou and Jacobs-related entities, and that many of the transactions between Allou and Impax are fraudulent.

UTA does not dispute the Plaintiffs' factual assertions, but argues that they do not create a genuine dispute as to a material fact. And UTA argues that these transfers were largely

16

donations or interest-free loans that were repaid.

Transfers Involving TTDY  The parties stipulate to the terms of five transfers from TTDY to UTA between May 2001 and March 2003, totaling $82,500.  UTA disputes that it received three transfers from TTDY between September 5, 2000, and May 9, 2002, totaling $3,500.  The parties also stipulate to the terms of two $100,000 transfers from UTA to TTDY on September 15, 1999, and November 15, 2001.  And the parties stipulate to the terms of a $15,000 transfer from Allou to TTDY on May 2, 2001.

Transfers Involving AMT  Three transactions took place involving Allou, AMT, and UTA, in the amounts of $200,000, $250,000, and $200,000.  Mr. Meisels, the principal of AMT, testified that at the request of Solomon Sander, he agreed to guarantee the repayment of certain loans made by Victor Jacobs through Allou to UTA.  Mr. Meisels testified that first AMT sent Allou a check that was post-dated by two to three months, as a form of guarantee.  Next, Allou forwarded a check in the same amount to AMT, and AMT sent a check in that amount to UTA.  Finally, two to three months later, UTA sent payment by check or wire to AMT, and Allou deposited AMT's original check.

AMT was not an active company at the time of these transactions.  Mr. Meisels testified that he used AMT, rather than one of his active businesses, in order to avoid problems in the event that UTA did not timely fund AMT's repayment to Allou.  In the first two transactions, AMT's post-dated check "bounced" when Allou attempted to deposit it.  Haddad Decl. Exh. 43 (1/4/2006 Meisels Tr. 122).

The parties dispute the purpose of these transactions, but they stipulate to the terms of certain transfers made in connection with them, including three transfers from Allou to AMT

between November 1999 and February 2000, three transfers from AMT to Allou between December 1999 and March 2000, three transfers from AMT to UTA between November 1999 and February 2000, and three transfers from UTA to AMT between December 1999 and March 2000. Allou recorded its transfers to AMT and two transfers that it received from AMT as loan-and-exchange transactions. The record does not show how Allou recorded a 1999 transfer from AMT.

The Plaintiffs argue that these transactions raise several issues. As one example, the Plaintiffs argue that the first series of transfers does not accord with Mr. Meisels' testimony, because the check from Allou to AMT was dated November 2, 1999, and the check from AMT to UTA was dated one month earlier, October 5, 1999. The Plaintiffs note that according to Mr. Meisels' account of these transactions, the check from AMT to UTA should be dated later than the check from Allou to AMT. At his deposition, Mr. Meisels testified that the check from AMT to UTA bearing the October 5, 1999 date was misdated, and that he believed he signed it on November 5, 1999.

UTA argues that the AMT transactions are not unusual or suspicious. UTA states that Mr. Meisels was acting as a guarantor on certain loans made by Victor Jacobs, through Allou, to UTA. And UTA notes that the three AMT transactions were booked by Allou to its loan-and-exchange account and repaid within three months of being issued.

<u>Transfers Involving the Evergreen Warehouse</u>  UTA argues that it used the Evergreen Warehouse for its fundraising dinners in 2001 and 2002, and that it paid Evergreen $10,000 on July 1, 2002, and $25,000 on November 15, 2002, for this purpose. UTA's administrator Isaac Mandel testified that Evergreen did not donate its services because it needed the money. The

18

Plaintiffs question the credibility of these assertions, noting that on January 30, 2002, Evergreen Warehouse donated $50,000 to UTA.  The Plaintiffs also argue that the November 15, 2002 payment does not appear to be legitimate because the Evergreen Warehouse was destroyed by a fire two months earlier.  The Plaintiffs assert that when advised of this at his deposition, Mr. Mandel changed his testimony after a break to indicate that the dinner was held the prior year and, in a submission to the Court, averred that the dinner was held in a different warehouse across the street from the Evergreen Warehouse.  And the Plaintiffs argue that the timing and amount of UTA's transfers to Evergreen Warehouse are suspicious because the warehouse was managed by Nachman Lichter, a co-conspirator of the Jacobs.

UTA argues that the December 2002 UTA fundraising dinner was held in a warehouse on Evergreen Avenue, but not at the Evergreen Warehouse, removing the suspicion from the November 2002 payment to Evergreen Warehouse.  UTA also contends that the Plaintiffs' attacks on Mr. Mandel's credibility are unwarranted, and that the break during his deposition was brief and arose from the videographer's need to change the tape.  UTA argues that the Plaintiffs' allegations concerning Mr. Lichter are not supported by evidence, and that even if they are true, they do not raise a genuine dispute as to any material fact.  And UTA notes that the Plaintiffs do not assert a claim relating to the Evergreen Warehouse, and that if the claims are allowed, Evergreen's $50,000 payment to UTA in January 2002 and UTA's $25,000 payment to Evergreen later in 2002 do not support a claim against UTA because the Plaintiffs cannot show that the funds came from Allou or were related to the Jacobs' fraud.

<u>The TJ Associates Transfer</u>  In July 2002, UTA transferred $50,000 to TJ Associates, a holding company for Jacobs-owned real estate.  The Plaintiffs assert that there was no business

purpose for this transfer.  And the Plaintiffs contend that while UTA claims that the payment was made for an expense in connection with its  annual fundraising dinner, they do not explain what it was for, TJ Associates did not provide services in connection with the dinner, and the Evergreen Warehouse where they claim the dinner was held was destroyed by a fire before it occurred.

UTA argues that this transfer was recorded in its books as a payment in connection with its annual fundraising dinner, which is its largest fundraising event and is typically attended by some 8,000 people each December.  UTA also argues that the Plaintiffs' claim about the warehouse burning down in September 2002 does not raise suspicion because the dinner was held in a nearby warehouse on Evergreen Avenue in Brooklyn, and not the same Evergreen Warehouse that was destroyed by a fire.

The G. Bauer Payment  The parties stipulate that Allou issued one or more checks to G. Bauer in the aggregate amount of $32,500.  The Plaintiffs argue that there was no business purpose for this transaction.

UTA argues that it received a donation from Victor Jacobs in March 1999 to install a new boiler.  UTA contends that this transaction is not suspicious, because G. Bauer is UTA's usual repair service for such matters.  UTA also states that Allou's records show that G. Bauer was paid $32,500 for work performed at UTA, and that Victor Jacobs charged it to Allou as an expense.  UTA also notes that the Plaintiffs do not identify this transfer in the Complaint, and argues that if this claim is considered at all, it should reduced by $18,000, corresponding to the amount that the Trustee received from G. Bauer in settlement of a separate adversary

proceeding.[4]

## **Discussion**

### The Summary Judgment Standard

Federal Rule of Civil Procedure 56, as amended effective December 1, 2010, provides

that "[t]he court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.

R. CIV. P. 56(a).[5]  A fact is "material" if it "might affect the outcome of the suit under the

governing law . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is

"'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson*, 477 U.S. at 248.

To make this assessment, "a court must construe the evidence in the light most favorable

to the nonmoving party, drawing all inferences in that party's favor." *Jeffreys v. City of New

York*, 426 F.3d 549, 553 (2d Cir. 2005).  And "when moving against a party who will bear the

ultimate burden of proof on an issue, 'the movant's burden will be satisfied if he can point to an

absence of evidence to support an essential element of the nonmoving party's claim.'"  *Kwon v.

Yun*, 606 F. Supp. 2d 344, 355 (S.D.N.Y. 2009) (quoting *Goenaga v. March of Dimes Birth

Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995)).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986) ("The moving party is entitled to judgment as a matter of law [if] the non-moving party

---

[4]  The parties stipulate that UTA received transfers from A&M Enterprises totaling $10,000 and a transfer from Spocan Equities in the amount of $7,200.  These transfers are not identified in the Complaint.

[5]  The Advisory Committee's note to Rule 56 states that "genuine 'issue' [was changed to] genuine 'dispute'. . . . to better reflect[] the focus of a summary-judgment determination."). FED. R. CIV. P. 56 Advisory Committee's note (2010).

has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.") (internal quotation marks omitted).

Summary judgment is appropriate only when, "after drawing all reasonable inferences in favor of a non-movant, no reasonable trier of fact could find in favor of that party." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986)). Where the plaintiff's claim must be established by clear and convincing evidence, "'the issue is whether, with all conflicts in the evidence resolved and all reasonable inferences drawn in favor of [the nonmoving party], the record contains sufficient evidence from which a reasonable jury could find [for the nonmoving party] under the clear and convincing standard.'" *Mendelsohn v. Jacobowitz (In re Jacobs)*, 394 B.R. 646, 658 (Bankr. E.D.N.Y. 2008) (second alteration added) (quoting *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 374 (S.D.N.Y.2003), *aff'd*, 99 Fed. Appx. 274 (2d Cir. 2004)). *See Anderson*, 477 U.S. at 255 (finding that the "clear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions").

Once the moving party satisfies its initial burden, the burden then shifts to the nonmoving party to come forward with evidence sufficient to create a genuine dispute as to a material fact for trial. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. Rather, it must present "significant probative evidence" that a genuine dispute as to a material fact exists. *Anderson*, 477 U.S. at 249 (internal quotation marks omitted). "There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor." *In re Jacobs*, 394 B.R. at 657 (internal quotation marks omitted).

22

Statements in the pleadings alone are not sufficient to meet this burden.  Rather, "[e]stablishing such facts requires going beyond the allegations of the pleadings, as the moment has arrived 'to put up or shut up.'"  *In re Eugenia VI Venture Holdings, Ltd. Litig.*, 649 F. Supp. 2d 105, 117 (S.D.N.Y. 2008) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000), *cert. denied*, 540 U.S. 811 (2003)), *aff'd*, 370 Fed. Appx. 197 (2d Cir. 2010). "Unsupported allegations in the pleadings thus cannot create a material issue of fact."  *In re Eugenia VI Venture Holdings*, 649 F. Supp. 2d at 117 (citing *Weinstock*, 224 F.3d at 41).

In addition, credibility assessments are rarely appropriate at the summary judgment stage, and should be reserved for the finder of fact at trial.  As the Second Circuit observed, "[i]t is a settled rule that credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment."  *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (internal quotation marks and alterations omitted).  *See Kwon*, 606 F. Supp. 2d at 355-56 ("A court must neither make judgments regarding credibility or conflicting versions of events, nor engage in any weighing of the evidence," because on summary judgment the court is not "tasked [] with resolving disputed issues of fact, but instead with determining whether any genuine issues of material fact remain to be tried").

Unsupported allegations that a witness lacks credibility are insufficient to create a genuine dispute as to a material fact.  *See John Hancock Life Ins. Co. v. Perchikov*, 553 F. Supp. 2d 229, 238 (E.D.N.Y. 2008) (finding that speculation about a witness' credibility based on "nonexistent inconsistencies between her affidavit and deposition testimony [] is unsubstantiated and insufficient to raise an issue of material fact"); *Thomas v. Great Atl. and Pac. Tea Co.*, 233

F.3d 326, 331 (5th Cir. 2000) (finding that "a motion for summary judgment cannot be defeated solely by conclusional allegations that a witness lacks credibility").  At the same time, a "well-supported suspicion of mendacity" may create a genuine dispute as to a material fact precluding summary judgment.  *Thomas*, 233 F.3d at 331.  *See Bang v. IBM Corp.*, 600 F. Supp. 2d 430, 436 (E.D.N.Y. 2009) (denying defendant's motion for summary judgment where credibility determinations were required).

While the issue of fraudulent intent ordinarily cannot be resolved on summary judgment, "it is also well-recognized that the summary judgment rule would be rendered sterile if the mere incantation of intent would operate as a talisman to defeat an otherwise valid motion."  *In re Jacobs*, 394 B.R. at 658 (internal quotation marks and ellipses omitted).  *See Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988) (finding that when intent is at issue, "summary judgment should be used sparingly" but that the "plaintiff must nevertheless offer 'concrete evidence from which a reasonable juror could return a verdict in his favor'") (quoting *Anderson*, 447 U.S. at 256).

And finally, the denial of summary judgment in the face of a genuine dispute as to a material fact does not amount to the court's endorsement of the strength of a plaintiff's claims. As one court observed, "[w]e do not imply that plaintiffs have a strong case but rather only that they have enough of a case to go to a jury."  *Huff v. UARCO, Inc.*, 122 F.3d 374, 385-86 (7th Cir. 1997).

Claim Two – Aiding and Abetting Fraud

The elements of a claim for aiding and abetting fraud under New York law are the existence of a primary fraud, the defendant's knowledge of that fraud, and the defendant's

24

substantial assistance in the achievement of that fraud.  *See Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*, 652 F. Supp. 2d 495, 502 (S.D.N.Y. 2009) ("*Pension Comm. I*") (citing *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006)); *Stanfield Offshore Leveraged Assets, Ltd. v. Metro. Life Ins. Co.*, 64 A.D.3d 472, 476 (N.Y. App. Div. 1st Dep't 2009).

UTA seeks summary judgment on this claim on grounds that the Plaintiffs cannot show that UTA had knowledge of the Jacobs' fraud, or that UTA substantially assisted in the commission of the fraud.  The Court considers these elements in turn.

### *UTA's Knowledge of the Fraud*

The knowledge element of an aiding and abetting fraud claim calls for a plaintiff to show that the defendant had actual, not constructive, knowledge of the underlying fraud.  *See Pension Comm. I*, 652 F. Supp. 2d at 503; *Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 246 (S.D.N.Y. 1996) ("[A]ctual knowledge is required to impose liability on an aider and abettor under New York law"), *aff'd*, 152 F.3d 918 (2d Cir. 1998).

Actual knowledge may be established by "sufficient facts to support a strong inference of fraudulent intent." *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 507 (S.D.N.Y. 2001) (internal quotation marks omitted).  This inference may be supported "by (1) showing a motive for participating in a fraudulent scheme and a clear opportunity to do so, or (2) identifying circumstances indicative of conscious behavior." *Askin*, 130 F. Supp. 2d at 507. *See AHT Corp. v. BioShield Techs., Inc. (In re AHT Corp.*), 292 B.R. 734, 746 (S.D.N.Y. 2003) (construing the standard on summary judgment).  "The burden of demonstrating actual knowledge, although not insurmountable, is nevertheless a heavy one." *Chemtex, LLC v. St.*

*Anthony Enters.*, 490 F. Supp. 2d 536, 549 (S.D.N.Y. 2007) (internal quotation marks omitted).

By contrast, evidence of recklessness, conscious avoidance, or willful blindness as to whether the primary actor is engaged in fraud is not sufficient to satisfy the knowledge element of this claim.  As one court observed, "the overwhelming weight of authority holds that . . . a lower standard such as recklessness or willful blindness" is insufficient to satisfy this element on aiding and abetting fraud claims.  *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*, 446 F. Supp. 2d 163, 202 n.279 (S.D.N.Y. 2006) ("*Pension Comm. II*") (collecting cases).  *See Rosner v. Bank of China*, 2008 WL 5416380, at *7-8 (S.D.N.Y. Dec. 18, 2008) (finding that "willful blindness" or "conscious avoidance" did not satisfy the actual knowledge requirement), *aff'd*, 349 Fed. Appx. 637 (2d Cir. 2009); *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 253 (S.D.N.Y. 2005) (finding that "recklessness" or "conscious disregard" did not satisfying the actual knowledge requirement).  And as explained in *Pension Committee I*:

> The "knowledge" element of an aiding and abetting fraud claim is not identical to the scienter required for the underlying fraud.  While a strong inference of scienter can be satisfied by a showing of facts that constitute strong circumstantial evidence of recklessness, aiding and abetting requires a reasonable inference of actual knowledge.

*Pension Comm. I*, 652 F. Supp. 2d at 502-03 (internal quotation marks and alterations omitted).

To be sure, a defendant's admission of actual knowledge of the underlying fraud is likely to be rare.  But such direct evidence of actual knowledge is not necessary to establish this element of the claim.  Rather, actual knowledge may be inferred from circumstantial evidence, provided that the central inquiry remains whether the evidence permits a reasonable finder of

fact to infer that the defendant *actually knew* of the underlying fraud.[6]  *See Pension Comm. I*, 652 F. Supp. 2d at 503-04 (actual knowledge may be shown by circumstantial evidence and the lack of an admission of knowledge does not entitle a defendant to summary judgment) (citing *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).

UTA argues that the Plaintiffs cannot show that it had actual knowledge of the Jacobs' fraud at Allou.  For purposes of summary judgment, UTA does not dispute several alleged facts, including that Victor Jacobs was instrumental in having Mr. Meisels placed in a position of authority at UTA and on UTA's board, that Mr. Meisels was "President and Chief Executive Officer at UTA," and that Mr. Meisels was a signatory on UTA's bank accounts.  UTA Mem. at 12.

UTA argues that the Plaintiffs' evidence in support of the actual knowledge element is no more than "(i) Victor Jacobs lobbied to have Meisels given responsibility, and placed on the board, at UTA; [and] (ii) Victor Jacobs' wife is a cousin of Arthur Meisels' father-in-law."  UTA Mem. at 14.  UTA contends that the Plaintiffs' attempt to cast Mr. Meisels as a close friend and associate of Victor Jacobs is not supported by the evidence because Mr. Meisels testified that he had met or spoken with Victor Jacobs only a few times, usually at large community events.  UTA notes that its witnesses did not testify to any knowledge of the Jacobs' fraud, and that "UTA's principal contacts with the Jacobs are deceased."  UTA Mem. at 19 n.12.

---

[6]  In the context of a fraudulent conveyance claim, circumstantial evidence may be reviewed under a "badges of fraud" analysis, "due to the difficulty of proving actual intent to hinder, delay, or defraud creditors."  *Sharp Int'l Corp. v. State St. Bank and Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005) (internal quotation marks omitted).  But courts in this Circuit have not applied the "badges of fraud" analysis to aiding and abetting fraud claims.  *See, e.g., In re Sharp Int'l Corp.*, 403 F.3d at 49-57.

And UTA notes that the Plaintiffs' "fundamental assertion" is that the "transactions between Allou and UTA are inherently suspect because Allou had no legitimate business to conduct with UTA and there is no formal documentation, such as loan agreements, that might be expected in a commercial context."  UTA Mem. at 15 (internal quotation marks and citations omitted).  UTA argues that the only business that it conducted with Allou was the receipt and return of interest-free loans and donations, that many of its witnesses testified that it routinely receives such loans and donations, and that these funds are necessary to its survival as a not-for-profit school serving the community.  As one example, UTA's former executive director testified that before Mr. Meisels' tenure, UTA received short-term interest-free loans from several different companies.  UTA further argues that all but one of the direct transfers and a majority of the indirect transfers from Allou to UTA were accurately recorded by Allou as loans or donations.

More generally, UTA argues that the Plaintiffs cannot create a genuine dispute as to UTA's actual knowledge by pointing to the "unusual" nature of these transactions.  UTA Mem. at 19-20.  UTA notes that several courts have found that the unusual nature of transactions, standing alone, is not sufficient to establish actual knowledge.  *See, e.g.*, *Kirschner v. Bennett*, 648 F. Supp. 2d 525, 545 (S.D.N.Y. 2009) (dismissing aiding and abetting claims and noting that "[e]ven if . . . the . . . Defendants helped effectuate the round-trip loans that transformed Refco's uncollectible losses into receivables owed to Refco by third-parties . . . such aid is not tantamount to the defendants' knowing about . . . the looting of customer accounts").

The Plaintiffs respond that the evidence creates a genuine dispute as to UTA's actual knowledge of the Jacobs' fraud.  The Plaintiffs argue that millions of dollars were transferred, in

dozens of transactions, among Allou, UTA and others, directly and through intermediaries, and that a substantial portion of these funds was returned to Allou or other entities to assist the Jacobs' misconduct at Allou.  The Plaintiffs contend that UTA benefitted from, and therefore had a motive to participate in, these transfers because they provided it with access to large amounts of money for no consideration, and because they enabled UTA to gain influence in the Satmar community.

The Plaintiffs also argue that, pursuant to the Second Circuit's decision in *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989), summary judgment is inappropriate where motive and intent are at issue.  They urge that Mr. Meisels' and Victor Jacobs' "state of mind go directly to the gravamen of the complaint" and are central to the determination of whether:

> UTA, Meisels, AMT and the Jacobs actively participated in a fraudulent scheme through which [Victor] Jacobs and Meisels used Allou corporate resources to advance the Jacobs-Meisels faction through a series of transactions that had no legitimate business purpose and to funnel Allou cash to the Jacobs family and its conspirators.

Pltfs' Opp. at 21.  The Plaintiffs contend that "UTA had a unique relationship with Victor Jacobs" so that:

> [UTA] knew of Victor Jacobs' role and responsibilities as chairman of publicly-traded Allou, and [] conspired with Victor Jacobs to take advantage of that relationship to aid and abet the Jacobs['] breach of fiduciary duties and to further their own illegitimate interests and those of the Jacobs-Meisels Faction to the detriment of Congress and Allou.

Pltfs' Opp. at 26.

And the Plaintiffs argue that there are genuine disputes as to material facts with respect to the nature and extent of Mr. Meisel's relationships with Victor Jacobs.  The Plaintiffs note that

Mr. Meisels testified that he did not have a longstanding relationship with Victor Jacobs, while other evidence shows that Mr. Meisels is related to the Jacobs and Mr. Meisel's and Victor Jacobs' families have members in common.  And the Plaintiffs argue that Mr. Meisel's testimony is inconsistent with UTA's explanation of the AMT transfers – that is, that AMT acted as a guarantor – because Mr. Meisels also testified that Victor Jacobs did not seek or receive information about Mr. Meisels' or AMT's ability to repay and made the transfers without any collateral.

In addition, the Plaintiffs point to the testimony of Rabbi Lieb Glanz that Victor Jacobs sought to have Mr. Meisels take over as UTA's "boss," that both Mr. Meisels and Victor Jacobs supported Zalman Teitelbaum in the succession dispute, and that when Mr. Meisels joined UTA, he "took over" the bookkeeping department, opened a special account, and made a large loan to UTA.  Haddad Decl. Exh. 39 (Glanz Tr. 15-27, 79-81, 106).  And they note that UTA's board did not exercise meaningful oversight, and that this enabled Victor Jacobs, Mr. Meisels, and others, to engage in improper activities including the laundering of funds through UTA.

The Plaintiffs argue that witness credibility is also an issue.  For example, they note that Mr. Meisels testified that after 2004, he no longer held a position of authority at UTA, and assert that this is contradicted by a June 1, 2006, document signed by Mr. Meisels on behalf of UTA in connection with a $1 million transaction.  *See* Haddad Decl. Exhs. 24 and 25.  But in a document dated December 22, 2005, related to UTA's annual fundraising dinner, Mr. Meisels is identified as "Manager of the Institutions."  Haddad Decl. Exh. 27.  The Plaintiffs also question the credibility of Isaac Mandel based on his demeanor during his deposition.  And the Plaintiffs note that as to the Evergreen Warehouse transfers, Mr. Mandel altered his testimony after learning

that UTA's 2002 fundraising dinner could not have been held there because the warehouse was lost in a fire earlier that year.

The Plaintiffs also question the authenticity and reliability of certain AMT documents, and note as one example that AMT's 1999 financial records contain an entry dated November 15, 2004.  Haddad Decl. Exhs. 26 and 26A.

The Plaintiffs point to additional evidence supporting the existence of a genuine dispute as to material fact concerning UTA's knowledge of the Jacobs' fraud, including that Victor Jacobs was the signatory on TTDY's bank accounts (JPTS at 13); Mr. Meisels was UTA's President and CEO, a signatory on its bank accounts, and the principal of AMT (Haddad Decl. Exh. 43 (Meisels Tr. 31)); transactions between Allou and AMT were in large round numbers and undocumented (JPTS at 19, Haddad Decl. Exh. 43 (Meisels Tr. 9)); UTA transferred $100,000 to Victor Jacobs' personal entity, TTDY, without a business purpose and for no consideration (JPTS at 59-61); and UTA transferred at least $50,000 to TJ Associates, a "real estate holding company" owned by the Jacobs (Haddad Decl. Exh. 8).  Pltfs' Opp. at 27.  The Plaintiffs also argue that the $300,000 round-trip transaction between Allou and UTA is suspicious because UTA was asked to return the funds one day after it received them.

UTA responds that the Plaintiffs' evidence does not raise a triable issue of fact as to its actual knowledge, and that the Plaintiffs cannot defeat summary judgment based on the bare hope that a trier of fact may not believe testimony denying knowledge of the fraud at Allou. UTA notes that several courts, including the Second Circuit Court of Appeals, have found that the possibility that the trier of fact may not credit a witness' testimony, without more, does not create a genuine dispute as to a material fact.

UTA also discounts the Plaintiffs' reliance on *Ramseur*, and disputes the proposition that "summary judgment is particularly inappropriate when an individual's state of mind is at issue." UTA Reply at 9 (internal quotation marks omitted). UTA notes that many courts have granted summary judgment on claims for aiding and abetting both fraud and breach of fiduciary duty based on the lack of evidence as to the defendant's actual knowledge.

The question for this Court on summary judgment is not whether the Plaintiffs should prevail, but whether there is a genuine dispute as to a material fact concerning UTA's knowledge of the fraud at Allou.

At the outset, the Court notes that over $29.8 million was transferred, in some 147 transactions, among Allou, UTA and others, directly and through intermediaries between 1997 and 2003, and more than $6 million was received by UTA. There is evidence that Victor Jacobs began attending board meetings at UTA in 1998, and that he was instrumental in placing Mr. Meisels into a position of power at UTA in 1999. It is undisputed that at this same time, Victor Jacobs was engaged in a massive fraud at Allou. There is also evidence that before and during Mr. Meisels' tenure, UTA looked to Victor Jacobs for financial support, including in the form of direct and indirect transfers of funds and as a guarantor of UTA's credit line and mortgages. And there is evidence that shows that Victor Jacobs and Mr. Meisels supported Rabbi Zalman Teitelbaum in the contentious dispute over the selection of the successor to the Grand Rebbe. Rabbi Glanz testified that when Rabbi Zalman Teitelbaum became involved with UTA, Victor Jacobs "took charge" of UTA and "push[ed] . . . to get everybody [on] one side and bring in new people . . . ." Haddad Decl. Exh. 39 (Glanz Tr. 99:13-19).

The record also shows that as a result of his position at UTA, Mr. Meisels was in charge

32

of UTA's bookkeeping department and a signatory on UTA's bank accounts. UTA received millions of dollars directly or indirectly from Allou from February 1997 to March 2003, and many of these transfers occurred after Mr. Meisels joined UTA. As one example, between August 1999 and June 2000, Crystal Clear made over $1.8 million in transfers to UTA.[7] As another, Mr. Meisels created AMT in 1999 and immediately used AMT in round-trip transactions totaling $650,000 between Allou and UTA. Mr. Meisels was similarly in place at UTA for each of nine stipulated transfers totaling over $1.1 million from Impax, a $100,000 transfer from Tereza, the eight stipulated transfers totaling $82,500 from TTDY, and a $50,000 transfer from Evergreen Warehouse. TTDY and Impax, and perhaps Tereza and Evergreen Warehouse, were controlled by the Jacobs. Mr. Meisels was also instrumental in a $100,000 transfer from UTA to TTDY in November 2001, and the Cambridge Mercantile transfer.

And the record shows that the parties dispute whether the receipt of short-term, interest-free loans, repayments to third parties, and loans through intermediaries were common practices in the Orthodox and Satmar communities and whether those transactions were commonly undertaken by public companies within those communities. But whether or not such transactions are common practice in that community, they may still lend support to the inference that UTA had knowledge of the Jacobs' fraud. That is, a reasonable trier of fact could find that those practices and transactions were used by Victor Jacobs to advance the fraud at Allou and by Mr. Meisels to meet UTA's operating expenses and to further the interests of the Jacobs-Meisels

---

[7] The parties stipulate that Allou transferred over $2.5 million to Crystal Clear between October 1997 and January 2002, and Allou booked five of the thirteen transfers to Crystal Clear as accounts payable. The parties also stipulate that Crystal Clear transferred $3.4 million to Allou, and that UTA transferred over $4.6 million to Crystal Clear between September 1997 and July 2002.

33

faction.  Indeed, UTA acknowledges that it "does not rely on these traditional practices to establish immunity . . . for those who might use them to engage in misconduct."  UTA Mem. at 16.[8]  And to the extent that UTA relies on the testimony of Mr. Meisels to refute the Plaintiffs' arguments and evidence, that testimony should be subject to a credibility assessment at trial.

In sum, based on the entire record, and drawing all reasonable inferences in favor of the nonmoving party, the Court finds that UTA has not established that there is no genuine dispute as to a material fact with respect to UTA's knowledge of the Jacobs' fraud.

### *UTA's Substantial Assistance in the Fraud*

The third element of a claim for aiding and abetting fraud is substantial assistance in the achievement of the fraud.  This requirement is met when "'a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the . . . fraud to occur.'"  *Pension Comm. I.*, 652 F. Supp. 2d at 503 (internal alterations omitted) (quoting *Lerner*, 459 F.3d at 295).  *See Sheehy v. New Century Mortg. Corp.*, 690 F. Supp. 2d 51, 72-74 (E.D.N.Y. 2010) (denying defendant's summary judgment motion where a reasonable trier of fact could find that defendant was not a mere "bystander," but instead knew of and actively participated in the fraud).  "[E]ven in the absence of a duty to act or disclose information, inaction on the alleged aider and abettor's part can provide a basis for liability where the inaction was designed intentionally to aid the primary fraud."  *Nisselson v. Ford Motor Co. (In re Monahan Ford Corp.*

---

[8]  For these reasons, it is not necessary to consider the admissibility of UTA's expert report, because it would not affect the disposition of this motion.  *See Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) (noting that courts perform the same gatekeeper function with respect to expert testimony on summary judgment and at trial); *United States v. U.S. Gypsum Co.*, 340 U.S. 76, 85 (1950) (finding that while defendants "had the right to lay facts before the court that were pertinent to the court's decision . . . [s]uch right[] . . . did not require the trial court to admit evidence that would not affect the outcome of the proceedings").

*of Flushing)*, 340 B.R. 1, 34 (Bankr. E.D.N.Y. 2006) (internal quotation marks omitted). As explained in *In re Monahan Ford Corp.*, "'[w]hether the assistance is substantial or not is measured . . . by whether the action of the aider and abettor proximately caused the harm on which the primary liability is predicated.'" *Id.* (internal quotation marks omitted) (quoting *Winnick*, 406 F. Supp. 2d at 256). "However, some [courts] question . . . whether the 'proximate cause' standard or a lesser standard should be utilized in the context of aiding and abetting liability." *Id.*

UTA argues that its receipt and return of funds from Allou does not support a finding of substantial assistance. UTA asserts that because Allou accurately recorded many of these transactions to its loan-and-exchange account, those transactions did not play a role in the Jacobs' fraudulent scheme to inflate receivables and inventory. UTA notes that the parties stipulate that Allou recorded each of the AMT transfers to its loan-and-exchange account. UTA argues that its $100,000 transfer of funds to TTDY did not substantially assist the Jacobs' scheme, because Allou recorded the initial transfer of $100,000 to UTA to its loan-and-exchange account, and UTA recorded its transfer to TTDY as a repayment of a loan. And UTA argues that Allou's transfer of $100,000 to UTA on July 1, 1999, which was recorded by Allou as an account payable to "Cambridge Mercantile," does not support a finding of substantial assistance. UTA argues that it had no way of knowing how Allou recorded the transfer and, in all events, at most the transfer may amount to "'but for' causation (of a $100,000 loss), [but] the 'proximate causation' required for substantial assistance with respect to the loss . . . lies with Allou fiduciaries, not with UTA." UTA Mem. at 36.

In response, the Plaintiffs point to much of the same evidence that supports their claim

that UTA had actual knowledge of the Jacobs' fraud at Allou.  That is, they argue that the record shows that Mr. Meisels had both a motive and the opportunity to participate in the Jacobs' fraud, and that Mr. Meisels' position at UTA enabled Victor Jacobs to transfer millions of dollars in illegitimate transfers to UTA.  And the Plaintiffs argue that this evidence shows that UTA was "not merely . . . an innocent conduit . . . but . . . an active co-conspirator."  Pltfs' Opp. at 32.

In addition, the Plaintiffs argue that transfers recorded by Allou as loan-and-exchange transactions were part of the Jacobs' fraud, because the fraudulent scheme involved not only misrepresentations as to accounts receivable and inventory, but also money laundering and other activities to further the interests of the Jacobs-Meisels faction.

Here too, the question for the Court on summary judgment is not whether the Plaintiffs should prevail, but whether there is a genuine dispute as to a material fact concerning UTA's substantial assistance in the achievement of the Jacobs' fraud at Allou.

More than $29.8 million was transferred in scores of transactions, among Allou, UTA, and others, directly and through intermediaries, and UTA received more than $6 million.  There is evidence that Victor Jacobs was instrumental in placing Mr. Meisels into a position of authority at UTA, and that both Mr. Meisels and Victor Jacobs supported Rabbi Zalman Teitelbaum in the contentious dispute over the selection of the successor to the Grand Rebbe. There is also evidence that as a result of his position at UTA, Mr. Meisels was in charge of UTA's bookkeeping department and a signatory on UTA's bank accounts.  The record shows that many of the transfers occurred after Mr. Meisels joined UTA, and there is evidence that Mr. Meisels was directly involved in many of these transactions including the AMT transactions, the $100,000 transfer from UTA to TTDY, and the Cambridge Mercantile transfer.  This evidence,

when viewed in the light most favorable to the Plaintiffs as the nonmoving party, is sufficient to raise a genuine dispute as to a material fact concerning whether UTA substantially assisted the fraud at Allou.

In sum, based on the entire record, and drawing all reasonable inferences in favor of the nonmoving party, the Court finds that UTA has not established that there is no genuine dispute as to a material fact with respect to whether it substantially assisted in the achievement of the Jacobs' fraud at Allou.[9]

Accordingly, UTA's motion for summary judgment on Claim Two, for aiding and abetting the Jacobs' fraud, is denied.

Claim One – Aiding and Abetting Breach of Fiduciary Duty

The elements of a claim for aiding and abetting a breach of fiduciary duty under New York law are a breach by a fiduciary, the defendant's knowing inducement or participation in that breach, and damages as a result of the breach. *See In re Sharp Int'l Corp.*, 403 F.3d at 49 (citing *Kaufman v. Cohen*, 307 A.D.2d 113, 125 (N.Y. App. Div. 1st Dep't 2003)); *S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843, 847-48 (2d Cir. 1987). *Cf. Design Strategy, Inc. v. Davis*, 469 F.3d 284, 303 (2d Cir. 2006).

Courts recognize that these elements have much in common with the elements of a claim for aiding and abetting fraud. As this Court observed, "[t]he elements of aiding and abetting fraud and aiding and abetting breach of fiduciary duty have some similarities. Each claim requires the defendant to have actual knowledge of the wrongdoing and to have substantially

---

[9] This conclusion is consistent with the proximate cause standard, and therefore the Court does not decide whether a lesser standard applies. *See Winnick*, 406 F. Supp. 2d at 256 n.6.

assisted in the wrongdoing." *Silverman v. H.I.L. Assocs. Ltd. (In re Allou Distribs., Inc.)*, 387 B.R. 365, 409 (Bankr. E.D.N.Y. 2008).

UTA seeks summary judgment on this claim on grounds that the Plaintiffs cannot show that UTA knowingly induced or participated in the Jacobs' breach of fiduciary duty.

### UTA's Knowing Inducement of or Participation in the Fiduciary Breach

As the Second Circuit has stated, "the 'relevant 'knowledge' for liability to attach for knowing participation in a fiduciary's breach of duty is knowledge as to the primary violator's status as a fiduciary and knowledge that the primary's conduct contravenes a fiduciary duty.'" *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*, 2002 WL 88226, *12 (S.D.N.Y. Jan. 23, 2002) (quoting *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 282-83 (2d Cir. 1992)). *See In re Sharp Int'l Corp.*, 403 F.3d at 49 ("'[A]lthough a plaintiff is not required to allege that the aider and abettor had an intent to harm, there must be an allegation that such defendant had actual knowledge of the breach of duty.'") (quoting *Kaufman*, 307 A.D.2d at 125).

Substantial assistance to the primary violator is a component of participation in a fiduciary breach. As the Second Circuit observed, "'[a] person knowingly participates in a breach of fiduciary duty only when he or she provides 'substantial assistance' to the primary violator.'" *Lerner*, 459 F.3d at 294 (quoting *Kaufman*, 307 A.D.2d at 126). "Substantial assistance may only be found where the alleged aider and abettor 'affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur.'" *In re Sharp Int'l Corp.*, 403 F.3d at 50 (quoting *Kaufman*, 307 A.D.2d at 126). But "'[t]he mere inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant

owes a fiduciary duty directly to the plaintiff.'" *Id.*[10]

UTA states that there is no genuine dispute as to a material fact with respect to its knowing inducement of or participation in the Jacobs' breach of fiduciary duty for many of the same reasons that it argues that the Plaintiffs cannot establish their claims for aiding and abetting fraud. In substance, UTA contends that Mr. Meisel's limited relationship with Victor Jacobs and its acceptance of donations and loans from Allou in a form consistent with traditional practices are insufficient to support the Plaintiffs' claim under the prevailing case law.

The Plaintiffs respond that there is a genuine dispute as to a material fact with respect to UTA's knowing inducement of or participation in the Jacobs' breach of fiduciary duty for several reasons that are similar to those advanced in support of their claims for aiding and abetting fraud. They argue that based upon the relationships between Victor Jacobs and UTA's principals, including Mr. Meisels, it is reasonable to infer that UTA knew that the Jacobs were officers of Allou and owed fiduciary duties to the company. The Plaintiffs contend that UTA should have questioned why Allou, a publicly-traded company in the pharmaceutical and health and beauty aid business, was making large transfers of funds to UTA. And they argue that the use of intermediaries to make some of those transfers and the repayment of some of the funds to other entities including entities controlled by Victor Jacobs should also have raised UTA's suspicions.

UTA responds that the kinship and other relationships between Mr. Meisels and Victor

---

[10] As with the substantial assistance element of an aiding and abetting fraud claim, some courts have found that the substantial assistance element of an aiding and abetting breach of fiduciary duty claim is governed by a proximate cause standard. *See, e.g.*, *Kolbeck*, 939 F. Supp. at 249. And here too, that standard is met, so the Court does not decide whether a lesser standard is appropriate.

Jacobs, and UTA's knowledge of the transfers between UTA and Allou, is insufficient to support the inference that it had actual knowledge of the Jacobs' breach of fiduciary duty. UTA argues that Allou was permitted to make charitable donations under the applicable state corporation laws, so that its practice of making short-term loans and charitable donations to UTA was not inherently suspect, and that making a loan to a charity is not a breach of fiduciary duty. UTA states that its acceptance of these loans is not grounds to infer that it knew of or substantially assisted the Jacobs' fiduciary breach, because Congress became aware of substantially the same information during the loan underwriting process and nevertheless extended credit to Allou. UTA notes that Congress' representatives testified that they did not consider this practice to be problematic.

And UTA responds that it could not have known that Victor Jacobs was breaching his fiduciary duty or assisted him in that conduct because the evidence does not show that UTA knew how Allou recorded the transfers on its books. UTA states that its transfer of funds to TTDY cannot be the basis for an inference of knowledge or substantial assistance, because the evidence does not show that it knew that Victor Jacobs controlled TTDY.

As with the Plaintiffs' claim for aiding and abetting fraud, the question for the Court on summary judgment is not whether the Plaintiffs should prevail, but whether there is a genuine dispute as to a material fact concerning UTA's knowing inducement of or participation in the Jacobs' breach of fiduciary duty.

As described above, the record shows that over $29.8 million was transferred, in scores of transactions, among Allou, UTA, and others, directly and through intermediaries between 1997 and 2003, and UTA received more than $6 million. Victor Jacobs began attending board

meetings at UTA in 1998, guaranteed UTA's credit line and mortgages, handwrote checks from Allou to UTA, and was instrumental in placing Mr. Meisels in a position of authority at UTA in 1999.  And there is evidence that shows a familial relationship between Victor Jacobs and Mr. Meisels and that both supported Rabbi Zalman Teitelbaum in the contentious dispute over the selection of the successor to the Grand Rebbe.  Further, Rabbi Glanz testified that when Rabbi Zalman became involved with UTA, Victor Jacobs "took charge" of UTA and "push[ed] . . . to get everybody [on] one side and bring in new people . . . ."  Haddad Decl. Exh. 39 (Glanz Tr. 99:13-19).

And the record also shows that Mr. Meisels was in charge of UTA's bookkeeping department and a signatory on its bank accounts.  UTA received millions of dollars directly and indirectly from Allou from February 1997 to March 2003, and many of these transfers occurred after Mr. Meisels joined UTA.  For example, Mr. Meisels created AMT in 1999 and immediately used it in round-trip transactions totaling $650,000 between Allou and UTA.  And Mr. Meisels was also in place at UTA at the time of transfers involving Crystal Clear, Impax, Tereza, TTDY, and Evergreen Warehouse, as well as the Cambridge Mercantile Transfer.

In sum, based on the entire record, and drawing all reasonable inferences in favor of the nonmoving party, the Court finds that UTA has not established that there is no genuine dispute as to a material fact with respect to UTA's knowing inducement or participation in the Jacobs' fiduciary breach.

Accordingly, UTA's motion for summary judgment on Claim One, for aiding and abetting the Jacobs' breach of fiduciary duty, is denied.

Claim Three - Civil Conspiracy

The elements of a claim for civil conspiracy under New York law are "'(1) the corrupt agreement between two or more persons, (2) an overt act, (3) their intentional participation in the furtherance of a plan or purpose, and (4) the resulting damages.'" *Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.)*, 379 B.R. 5, 36 (Bankr. E.D.N.Y. 2007) (quoting *Pope v. Rice*, 2005 WL 613085, at *13 (S.D.N.Y. Mar. 14, 2005)).

UTA argues that this claim is duplicative of the Plaintiffs' aiding and abetting fraud and aiding and abetting breach of fiduciary duty claims, and therefore, should be dismissed.

The Plaintiffs respond that a civil conspiracy claim is not duplicative of other claims if it is based on independent acts "that do not form the basis for other claims for relief." Pltfs' Opp. at 35. And the Plaintiffs argue that the numerous transactions among Allou, UTA, and other entities, and the alleged money laundering scheme to further the interests of the Jacobs-Meisels faction, support this claim.

Courts agree that civil conspiracy claims that are duplicative of other claims, including aiding and abetting claims, should be dismissed. For example, in *Buchwald v. Renco Group (In re Magnesium Corp.)*, 399 B.R. 722 (Bankr. S.D.N.Y. 2009), the court found:

> Several courts have held that under New York law, where the conduct put forth in support of a claim of conspiracy is the same conduct that supports the underlying actionable torts, the conspiracy claim should be dismissed as duplicative. Here, the alleged conduct in support of the conspiracy claims is identical to that alleged in the causes of action asserted against each Defendant for breach of fiduciary duty. Except for the conclusory allegation that each Conspiracy Defendant "associated" and "mutually undertook" with each of the other Conspiracy Defendants, the Trustee does not allege any independent acts beyond that conduct supporting the relevant underlying torts. And New York Courts have consistently required a plaintiff to allege "in addition to the conspiracy, *independent overt acts* undertaken in pursuit of that conspiracy." Absent the allegation of such independent overt acts, the causes of action for conspiracy fail.

*Buchwald*, 399 B.R. at 775-76 (quoting *Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc. (In re*

*Stratton Oakmont, Inc.*), 234 B.R. 293, 332 (Bankr. S.D.N.Y. 1999)).  *See 380544 Canada, Inc. v. Aspen Tech., Inc.*, 633 F. Supp. 2d 15, 36 (S.D.N.Y. 2009) (dismissing civil conspiracy claim as duplicative of common law fraud claim); *Briarpatch Ltd. v. Geisler Roberdeau, Inc.*, 2007 WL 1040809, at *26 (S.D.N.Y. Apr. 4, 2007) (dismissing civil conspiracy claim on summary judgment as duplicative of breach of fiduciary duty claim), *aff'd*, 312 Fed. Appx. 433 (2d. Cir.), *cert. denied*, 130 S. Ct. 257 (2009); *Stratton Oakmont, Inc.*, 234 B.R. at 332 (dismissing civil conspiracy claim because overt acts alleged also formed basis for other claims); *Kew Gardens Hills Apartment Owners, Inc. v. Horing Welikson & Rosen, P.C.*, 35 A.D.3d 383, 386 (N.Y. App. Div. 2d Dep't 2006) (dismissing conspiracy claim as duplicative of aiding and abetting claim).

Here, the Plaintiffs' allegations that support their civil conspiracy claim, including the transactions among Allou, UTA, and other entities, the alleged money laundering scheme, and the shared interests of the Jacobs-Meisels faction, also form the basis for the Plaintiffs' claims of aiding and abetting fraud and aiding and abetting breach of fiduciary duty.  That is, the Plaintiffs have not identified "independent acts" in support of this claim beyond those alleged in support of their aiding and abetting claims.

Accordingly, UTA's motion for summary judgment on Claim Three, for civil conspiracy, is granted.

Claims Four Through Nine – Constructive and Intentional Fraudulent Transfer

Claims Four through Nine seek the avoidance and recovery of specific transfers among Allou, UTA, and other entities.  The Trustee brings Claims Four through Seven under DCL Sections 276, 273, 274, and 275, respectively, and Bankruptcy Code Sections 544(b), 550(a),

and 551.[11]  And the Trustee brings Claims Eight and Nine under Bankruptcy Code Sections 548(a)(1)(A) and (B), 550(a), and 551.

### *Avoidance of Fraudulent Transfers Under New York's Debtor and Creditor Law*

Bankruptcy Code Section 544(b) authorizes the Trustee to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim . . . ."  11 U.S.C. § 544(b)(1).  Here, the "applicable law" is DCL Sections 273, 274, 275, and 276.

#### *Fraudulent Transfer Under DCL Section 276 – Actual Fraud*

DCL Section 276 provides that "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."  DCL § 276.  "To prove actual fraud under § 276, a creditor must show intent to defraud on the part of the transferor."  *In re Sharp Int'l Corp.*, 403 F.3d at 56 (internal quotation marks and alterations omitted).  At the same time, "'[i]t is well accepted that intent to hinder or delay creditors is sufficient, and intent to defraud need not be proven.'"  *In re Jacobs*, 394 B.R. at 658 (internal alterations omitted) (quoting *Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*, 376 B.R. 390, 403 (Bankr. S.D.N.Y. 2007)).

"Badges of fraud" may be used to establish fraudulent intent.  *See Lippe*, 249 F. Supp. 2d at 374-75.  These include:

1) gross inadequacy of consideration; 2) a close relationship between transferor

---

[11]  The Trustee brings Claim Four under DCL Section 276 to avoid specific transfers and DCL Section 276-a to recover attorneys' fees.  The parties' arguments concerning DCL Section 276-a are considered below.

and transferee; 3) the transferor's insolvency as a result of the conveyance; 4) a questionable transfer not in the ordinary course of business; 5) secrecy in the transfer; and 6) retention of control of the property by the transferor after the conveyance.

*Lippe*, 249 F. Supp. 2d at 375.  For purposes of this motion, UTA assumes that the Trustee will be able to show that the transfers at issue were made by Allou's principals with the actual intent to hinder, delay, or defraud Allou's creditors.

Where the debtor's "actual intent to defraud creditors is proven, the conveyance will be set aside [under DCL Section 276] regardless of the adequacy of consideration given."  *United States v. McCombs*, 30 F.3d 310, 328 (2d Cir. 1994).  But DCL Section 276 also requires a plaintiff to demonstrate injury in order to state a claim.  *See Lippe*, 249 F. Supp. 2d at 375. "Indeed, it is hornbook law that '[a] conveyance cannot be fraudulent as to creditors if the debtor's solvency is not affected thereby, that is, if the conveyance does not deplete or otherwise diminish the value of the assets of the debtor's estate remaining available to creditors.'"  *Lippe*, 249 F. Supp. 2d at 375 (quoting 30 N.Y. Jur. 2d *Creditors' Rights & Remedies* § 305 (2003)).

Even when the debtor's actual intent is proven, the DCL offers protection to an innocent transferee who has given less than fair consideration in exchange for the conveyance.  DCL Section 278(2) states that "[a] purchaser who without actual fraudulent intent has given less than a fair consideration for the conveyance or obligation, may retain the property or obligation as security for repayment."  DCL § 278(2).  The transferee must "affirmatively show good faith in order to take advantage of Section 278(2)."  *In re Jacobs*, 394 B.R. at 659.

*Fraudulent Transfer Under DCL Sections 273, 274, and 275 – Constructive Fraud*

Under DCL Sections 273,[12] 274,[13] and 275[14] a transfer is deemed constructively fraudulent if it is made without fair consideration, and one of the following conditions is met:

"(i) the transferor is insolvent or will be rendered insolvent by the transfer in question, DCL § 273; (ii) the transferor is engaged in or is about to engage in a business transaction for which its remaining property constitutes unreasonably small capital, DCL § 274; or (iii) the transferor believes that it will incur debt beyond its ability to pay, DCL § 275."

*In re Jacobs*, 394 B.R. at 660 (quoting *In re Sharp Int'l Corp.*, 403 F.3d at 53). The parties stipulate that Allou was insolvent for purposes of these claims.

A party seeking to set aside a transfer under DCL's constructive fraud provisions must establish by a preponderance of the evidence that the conveyance was not made for fair consideration. *See In re Jacobs*, 394 B.R. at 660. DCL Section 272 defines "fair consideration" as being given for property or an obligation:

a.    When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

b.    When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small

---

[12]  DCL Section 273 provides that "[e]very conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." DCL § 273.

[13]  DCL Section 274 provides that "[e]very conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent." DCL § 274.

[14]  DCL Section 275 provides that "[e]very conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors." DCL § 275.

as compared with the value of the property, or obligation obtained.

DCL § 272.  Under DCL Section 272, "'fair consideration has two components — the exchange of fair value and good faith – and both are required.'"  *SEC v. Universal Express, Inc.*, 2008 WL 1944803, at *5 (S.D.N.Y. Apr. 30, 2008) (quoting *Lippe*, 249 F. Supp. 2d at 376-77).

As such, good faith is an element of fair consideration, and the plaintiff bears the burden to prove lack of good faith.  *See Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*, 426 B.R. 467, 476 (Bankr. S.D.N.Y. 2010); *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs. Ltd.)*, 337 B.R. 791, 802 (Bankr. S.D.N.Y. 2005) (citing *McCombs*, 30 F.3d at 326).  And "'for purposes of § 272, the 'good faith' at issue is the good faith of the transferee, as opposed to, in the case of actual fraud under § 276, the good faith of the transferor.'"  *In re Jacobs*, 394 B.R. at 660 (internal alterations omitted) (quoting *Lippe*, 249 F. Supp. 2d at 377).

In assessing a party's good faith, courts have found:

> "A person seeking to set aside a conveyance upon the basis of lack of good faith must prove that one or more of the following factors is lacking: (1) an honest belief in the propriety of the activities in question; (2) no intent to take unconscionable advantage of others; and (3) no intent to, or knowledge of the fact that the activities in question will hinder, delay, or defraud others. . . ."  In short, "the lack of good faith imports a failure to deal honestly, fairly and openly."

*Ostashko v. Ostashko*, 2002 WL 32068357, at *22-23 (E.D.N.Y. Dec. 12, 2002) (internal alterations and citations omitted) (quoting *Southern Indus., Inc. v. Jeremias*, 66 A.D.2d 178, 183 (N.Y. App. Div. 2d Dep't 1978)), *aff'd*, 79 Fed. Appx. 492 (2d Cir. 2003).  Where "a transferee has given equivalent value in exchange for the debtor's property," the Second Circuit has concluded that "the statutory requirement of 'good faith' is satisfied if the transferee acted without either actual or constructive knowledge of any fraudulent scheme."  *HBE Leasing Corp.*

47

*v. Frank*, 48 F.3d 623, 636 (2d Cir. 1995). *See* DCL § 278(1) (setting forth that "[w]here a conveyance . . . is fraudulent as to a creditor, such creditor" may set aside or disregard that conveyance against anyone "except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase . . .").

> *Avoidance of Fraudulent Transfers Under the Bankruptcy Code*

> *Fraudulent Transfer Under Bankruptcy Code Section 548(a)(1)(A) – Actual Fraud*

"Like DCL Section 276, Bankruptcy Code Section 548(a)(1)(A) applies to transfers made with intent to deceive . . . ." *In re Jacobs*, 394 B.R. at 661. Section 548(a)(1)(A) authorizes a trustee to avoid any transfer made by the debtor if the debtor "made such transfer . . . with actual intent to hinder, delay, or defraud" creditors. 11 U.S.C. § 548(a)(1)(A). If the trustee proves that the debtor made the transfer with such actual intent, then "the entirety of the transfer is avoidable" even if reasonably equivalent value is given in exchange. *Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Group, LLC)*, 362 B.R. 624, 629 (Bankr. S.D.N.Y. 2007). As with a claim under DCL Section 276, a plaintiff cannot recover under Bankruptcy Code Section 548(a)(1)(A) if it does not demonstrate an injury flowing from the transfer.

But a defendant who can show that it received the transfer in good faith and for value is not without recourse. Bankruptcy Code Section 548(c) provides that a transferee "that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred . . . to the extent that such transferee . . . gave value to the debtor in exchange for such transfer . . . ." 11 U.S.C. § 548(c). The transferee bears the burden of proof on this defense. *See In re Bayou Group*, 362 B.R. at 631. "'Good faith' is not a defined term in the Bankruptcy Code, and is properly determined on a case-by-case basis." *Comm. of Unsecured*

48

*Creditors of Interstate Cigar Co. v. Interstate Distrib., Inc. (In re Interstate Cigar Co.)*, 285 B.R. 789, 797 (Bankr. E.D.N.Y. 2002), *aff'd*, 2003 WL 22885591 (E.D.N.Y. Nov. 25, 2003).

*Fraudulent Transfer Under Bankruptcy Code Section 548(a)(1)(B) – Constructive Fraud*

Bankruptcy Code Section 548(a)(1) provides:

(a)(1)   The trustee may avoid any transfer . . . of an interest of the debtor in property, . . . incurred by the debtor, . . . if the debtor voluntarily or involuntarily . . .

(B)(i)   received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii) (I)    was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II)   was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(III)  intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV)   made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B).  The Bankruptcy Code does not define "reasonably equivalent value." *See Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners (In re Fedders N. Am.)*, 405 B.R. 527, 546 (Bankr. D. Del. 2009).  "Rather, Congress left to the courts the task of setting forth the scope and meaning of this term, and courts have rejected the application of any fixed mathematical formula to determine reasonable equivalence." *In re Fedders N. Am.*, 405 B.R. at 546.

Section 548(d)(2)(A) defines "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor . . . ."  11 U.S.C. § 548(d)(2)(A).  As one court found:

> The determination of whether the debtor received reasonably equivalent value for his interest requires the court to compare what was given with what was received. It is not necessary that there be 'mathematical precision' or a 'penny-for-penny' exchange in order to establish reasonably equivalent value.  The court must determine whether reasonably equivalent value was exchanged based on the facts and circumstances of each case.

*Pergament v. Reisner (In re Reisner)*, 357 B.R. 206, 211 (Bankr. E.D.N.Y. 2006) (internal quotation marks, citations, and alterations omitted).  "The 'reasonably equivalent value' standard of Section 548(a)(1)(B) differs from the 'fair consideration' standard under the DCL primarily in that it does not contain the good faith element." *In re Jacobs*, 394 B.R. at 662.  And the terms "reasonably equivalent value" and "value" as used in Bankruptcy Code Sections 548(a)(1)(B) and (C), and "fair equivalent" and "fair consideration," with the exception of the good faith component, as used in DCL Sections 272 and 278 "have the same fundamental meaning . . . and are interpreted similarly by the courts." *Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortg. Inv. Corp.*, 256 B.R. 664, 677 (Bankr. S.D.N.Y. 2000) (citing cases), *aff'd*, 264 B.R. 303 (S.D.N.Y. 2001).

### *Recovery of Transfers Avoided Under the DCL and the Bankruptcy Code*

Bankruptcy Code Section 551 provides that any transfer that is "avoided . . . is preserved for the benefit of the estate . . . ."  11 U.S.C. § 551.  The issue of whether a transfer is avoidable is distinct from the issue of recovery. *See Bruno Mach. Corp. v. Troy Die Cutting Co. (In re Bruno Mach. Corp.)*, 435 B.R. 819, 847 (Bankr. N.D.N.Y. 2010).  "An avoidance nullifies the transfer.  As a result, the transferred property becomes a part of the estate automatically." *In re Bruno Mach. Corp.*, 435 B.R. at 847 (internal quotation marks omitted).

Bankruptcy Code Section 550(a) provides that "to the extent that a transfer is avoided . . . the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property . . . ." 11 U.S.C. § 550(a).[15]  "Section 550(a) is intended to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred." *Hirsch v. Gersten (In re Centennial Textiles, Inc.)*, 220 B.R. 165, 176 (Bankr. S.D.N.Y. 1998).  *See Marine Midland Bank v. Murkoff*, 120 A.D.2d 122, 133 (N.Y. App. Div. 2d Dep't 1986) ("The creditor's remedy in a fraudulent conveyance action is limited to reaching the property which would have been available to satisfy the judgment had there been no conveyance . . .").  Punitive or exemplary damages may not be recovered under Section 550, regardless of "their possible availability under state law." *Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*, 429 B.R. 73, 111 (Bankr. S.D.N.Y. 2010).  And under Bankruptcy Code Section 550(d), "[t]he trustee is entitled to only a single satisfaction under [Section 550(a)]." 11 U.S.C. § 550(d).

### Whether UTA Is Entitled to Judgment on the Trustee's DCL Section 276, 273, 274, and 275 Claims

UTA seeks partial summary judgment on Claims Four through Seven with respect to the Trustee's claims to recover transfers in the aggregate amount of $6,401,580, on various grounds.

The Trustee alleges that UTA received $688,350 in direct transfers from Allou to UTA. The parties stipulate to the circumstances of $656,450 in such direct transfers, but UTA denies receiving the remainder, representing eleven transfers totaling $31,900 from September 1997 to December 2002.  With respect to these direct transfers, UTA seeks partial summary judgment on

---

[15]  DCL Section 278 provides that a fraudulent conveyance may be "set aside or . . . annulled to the extent necessary to satisfy [the] claim . . . ."  DCL § 278.

grounds that there is no genuine dispute as to a material fact with respect to whether it received $31,900 in transfers, that the Trustee is time-barred from avoiding a $3,000 transfer made more than six years before the petition date, and that it repaid in good faith $380,000 of the amounts transferred to it.

The Trustee alleges that UTA received $5,713,230 in transfers through intermediaries. As to these indirect transfers, UTA seeks partial summary judgment with respect to transfers involving Crystal Clear, Tereza, and AMT, in the amounts of $2,724,630, $105,000, and $650,000, respectively.  As to Crystal Clear, UTA argues that there is no genuine dispute as to a material fact with respect to whether it received two transfers totaling $224,630, or whether eight transfers totaling $1.3 million originated at Allou.  UTA also argues that it repaid in good faith an additional $1.2 million of the amounts transferred to it.  As to Tereza, UTA contends that there is no genuine dispute as to a material fact with respect to whether a $100,000 transfer originated at Allou, or whether it received a $5,000 transfer.  And with respect to AMT, UTA argues that there is no genuine dispute as to a material fact with respect to whether it repaid in good faith each transfer that it received.

### *Whether UTA Is Entitled to Judgment with Respect to $31,900 in Direct Transfers*

UTA argues that there is no genuine dispute as to a material fact with respect to whether it received eleven transfers from Allou totaling $31,900.  UTA contends that it has no record of receiving these transfers, and that the Trustee has not come forward with evidence sufficient to show that it did.  The Trustee argues that there is a genuine dispute as to a material fact because each of the eleven transfers was recorded by Allou as paid to UTA, and submits eight checks and three internal Allou payment records in support of its claim.

The record shows that three checks are payable to an entity other than UTA.  Two checks, in the amounts of $3,600 and $2,500, are payable to "UTA Preservation," and the third, in the amount of $7,500, is payable to "United Talmudical Academy of Monsey."  Haddad Decl. Exh. 34.  UTA denies that either entity is affiliated with it, and argues the Trustee has not come forward with evidence sufficient to establish a genuine dispute as to a material fact concerning whether these transfers were received by or for the benefit of UTA.

Five other checks are payable to "UTA" but were deposited or endorsed to entities other than UTA.  Two checks, each in the amount of $500, were deposited into a Fleet Bank account, a $4,200 check was deposited into a Chase bank account, a $1,000 check was endorsed to an account of "Machne Rav Tov" at HSBC, and a $4,000 check was endorsed to "United Talmudical Academy of Kiryas Joel Inc."  UTA argues that these checks, while made out to an entity with "UTA" in its title, were not deposited into a bank account affiliated with it.  The three internal Allou records show transfers from Allou totaling $8,100 made on October 1, October 11, and October 17, 2001.  Haddad Decl. Exh. 34.  One record indicates a transfer of $2,500 to "UTA Antwerp," and two records indicate transfers to "UTA."  Haddad Decl. Exh. 34.

In his Declaration, Mr. Mandel avers that "Machne Rav Tov," "Camp Machne [illegible] Yoel Corp.," "UTA Preservation," "UTA Antwerp," and "UTA Monsey" are not affiliated with UTA.  Mandel Reply Decl. ¶ 3.  The Trustee does not respond with evidence that Machne Rav Tov, UTA Preservation, UTA Antwerp, UTA Monsey, and United Talmudical Academy of Kiryas Joel Inc., were affiliated with UTA.  Nor does the Trustee identify evidence that the checks payable to "UTA" were deposited into UTA's bank accounts or were for the benefit of UTA.  And the internal Allou records indicating payment to "UTA" are insufficient to create a

53

triable dispute of fact as to whether payment was made to or for the benefit of the defendant UTA. *See Williams v. Congregation Yetev Lev*, 2008 WL 852450, at *5 (S.D.N.Y. Mar. 31, 2008) (granting defendant Congregation Yetev Lev's motion for summary judgment finding that the plaintiff had "offered no evidence that any check was actually endorsed to the Brooklyn Congregation, rather than another organization, referred to as Congregation Yetev Lev").

It is well settled that the "law does not recognize 'a creditor's remedy for money damages against parties who . . . were neither transferees of the assets nor beneficiaries of the conveyance.'" *Roselink Investors, L.L.C. v. Shenkman*, 386 F. Supp. 2d 209, 226 (S.D.N.Y. 2004) (quoting *F.D.I.C. v. Porco*, 75 N.Y.2d 840, 842 (1990)).  That is, "there can be no action for damages against a party who did not receive any of the property sought by the creditors." *Shenkman*, 386 F. Supp. 2d at 227.

Here, based on the entire record, UTA has shown that there is no genuine dispute as to a material fact with respect to whether it received the $31,900 in direct transfers, and the Trustee has not come forward with evidence sufficient to create a genuine dispute as to a material fact on this element of its claim.  Accordingly, UTA's motion for partial summary judgment with respect to the Trustee's claims under the DCL to recover these transfers is granted.

*Whether UTA Is Entitled to Judgment with Respect to $3,000 in a Direct Transfer*

UTA argues that there is no genuine dispute as to a material fact with respect to whether the Trustee may avoid one of the stipulated direct transfers in the amount of $3,000, because it occurred on February 3, 1997, outside of the six-year limitations period for claims under the DCL.  The Trustee does not dispute the date of the transfer or the applicable limitations period, but argues that equitable tolling is justified because the transfers were "self-concealing."  Pltfs'

54

Opp. at 41 n.4.

New York state law fixes the limitations period for claims under the DCL.  A claim based on actual fraud under DCL Section 276 must be brought within the later of six years from the date of the fraud or conveyance, or two years from the date that the fraud should have been discovered.  *See Liberty Co. v. Boyle*, 272 A.D.2d 380, 381 (N.Y. App. Div. 2d Dep't 2000).  A claim based on constructive fraud must be brought within six years from the date of the conveyance.  *See Liberty Co.*, 272 A.D.2d at 381.  The two-year discovery rule applicable to actual fraud claims does not apply to constructive fraud claims.  *See Wall St. Assocs. v. Brodsky*, 257 A.D.2d 526, 530 (N.Y. App. Div. 1st Dep't 1999).  The defendant bears the burden of establishing the affirmative defense that a claim is time-barred, and the plaintiff bears the burden of establishing that an exception such as equitable tolling applies.  *See Lefkowitz v. Appelbaum*, 258 A.D.2d 563, 563 (N.Y. App. Div. 2d Dep't 1999).

Equitable tolling may apply where the defendant "'actively misled'" the plaintiff or the plaintiff was "'in some extraordinary way . . . prevented from complying with the limitations period.'"  *Shared Commc'ns Servs. of ESR, Inc. v. Goldman, Sachs & Co.*, 38 A.D.3d 325, 325 (N.Y. App. Div. 1st Dep't 2007) (quoting *O'Hara v. Bayliner*, 89 N.Y.2d 636, 646, *cert. denied*, 522 U.S. 822 (1997)).  A defendant may be estopped from asserting a statute of limitations defense "where plaintiff was induced by [the defendant's] fraud, misrepresentations or deception to refrain from filing a timely action."  *Simcuski v. Saeli*, 44 N.Y.2d 442, 449 (1978).  New York courts often rely on the same analysis for these doctrines.  *See Meridien Int'l Bank Ltd. v. Gov't of Rep. of Liber.*, 23 F. Supp. 2d 439, 446 n.4 (S.D.N.Y. 1998).

A plaintiff asserting equitable estoppel must allege facts that support estoppel.  *See T & N*

*PLC v. Fred S. James & Co. of N.Y., Inc.*, 29 F.3d 57, 62 (2d Cir. 1994). But equitable estoppel cannot be applied when the same facts form the basis of both the estoppel argument and the underlying claim for fraud. *See Kaufman*, 307 A.D.2d at 122. And "[i]t is well settled that '[t]he doctrine of equitable estoppel is to be invoked sparingly and only under exceptional circumstances.'" *Townley v. Emerson Elec. Co.*, 269 A.D.2d 753, 753-54 (N.Y. App. Div. 4th Dep't 2000) (quoting *Matter of Gross v. N.Y.C. Health & Hosps. Corp.*, 122 A.D.2d 793, 794 (N.Y. App. Div. 2d Dep't 1986)).

The Trustee does not argue that this claim was brought within two years of when it should have been discovered as permitted under DCL Section 276. Rather, he argues that equitable tolling is appropriate because "the Defendants structured the transfers to make them difficult to trace, and thereby perpetrated a fraud that was by its nature 'self-concealing.'" Pltfs' Opp. at 41 n.4. But the Trustee does not identify sufficient facts that are distinct from the alleged facts in support of the underlying fraud, or that support UTA's active concealment of the fraud, to create a genuine dispute as to a material fact with respect to whether equitable tolling should apply. *See State of N.Y. v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1084 (2d Cir.) (discussing the rule and identifying the conduct of defendants that helped conceal the fraud), *cert. denied*, 488 U.S. 848 (1988); *Bobash, Inc. v. Festinger*, 57 A.D.3d 464, 467 (N.Y. App. Div. 2d Dep't 2008) (finding that estoppel argument did not apply to constructive and actual fraud claims under the DCL because it was based on same allegations as underlying fraud claims).

Here, based on the entire record, UTA has shown that there is no genuine dispute as to a material fact with respect to whether the Trustee's claim to recover $3,000 is barred by the

statute of limitations, and the Trustee has not come forward with evidence sufficient to create a genuine dispute as to a material fact on whether equitable tolling or estoppel should apply. Accordingly, UTA's motion for partial summary judgment with respect to the Trustee's claims under the DCL to recover this transfer is granted.

*Whether UTA Is Entitled to Judgment with Respect to $380,000 in Direct Transfers*

UTA argues that there is no genuine dispute as to a material fact with respect to whether it repaid in good faith an additional $380,000 of the direct transfers. The parties stipulate that UTA made payments totaling $380,000 to Allou between September 1997 and May 2002.[16]

Relying on DCL Section 278, UTA argues that "summary judgement is . . . warranted unless the Trustee can identify a triable issue of fact calling into question whether UTA repaid the amounts it received in good faith." UTA Mem. at 45. The Trustee contends that there are triable disputes of fact concerning UTA's good faith, and that regardless of repayment, the transfers damaged the estate. The Trustee states that if the transfers were loans, Allou suffered a loss in the form of foregone interest, and if the transfers were donations, then Allou lost tax benefits because it did not report the transactions as charitable contributions. And the Trustee states that the transfers diminished the value of the estate because they were "part of the greater fraud at Allou leading to the liquidation of Allou and harm [to] all creditors." Pltfs' Opp. at 39 n.3.

In response, UTA argues that the Trustee does not raise a genuine dispute as to a material fact with respect to its good faith in taking or repaying the transfers. UTA notes that it is the

---

[16] The parties stipulate that UTA paid $30,000, $50,000, and $300,000, to Allou by checks dated September 2, 1997, May 26, 2000, and May 10, 2002, respectively.

Trustee's burden to prove constructive fraud under the DCL, and that burden includes proving UTA's lack of good faith. UTA also notes that "because obligations that are repaid pre-petition are seldom the subject of fraudulent conveyance claims (because they do not diminish the estate) Plaintiffs' authorities . . . do not . . . address any necessity of showing good faith in relation to the *repayment*, as opposed to the original transfer." UTA Reply at 43. And UTA argues that because the funds were returned, the Trustee cannot demonstrate that there was a reduction in the value of Allou's estate that harmed its creditors.

As discussed in the context of the Plaintiffs' aiding and abetting claims, there are genuine disputes as to material facts with respect to whether UTA knowingly participated in the Jacobs' misconduct at Allou. These same disputed facts are relevant to whether UTA acted in good faith and whether it had knowledge of the Jacobs' fraud when it received these transfers. That is, UTA has not shown that there is no genuine dispute as to a material fact with respect to its defense under DCL Section 278, or the good faith element of fair consideration.

Nor has UTA shown that there is no genuine dispute as to a material fact with respect to fair value element of fair consideration. The parties stipulated that UTA received $656,450 in sixteen direct transfers from Allou, and repaid $380,000 in three transfers. Only one of the transfers from UTA to Allou, which was part of the $300,000 round-trip transaction, corresponds in dollar amount to a transfer received from Allou. Whether these transfers are considered discretely or in the aggregate, there is a genuine dispute as to a material fact with respect to whether they amount to a fair equivalent value. Viewed discretely, there is a genuine dispute as to a material fact with respect to whether each transaction was a gratuitous exchange or Allou received value in return. Taken in the aggregate, there is a genuine dispute as to a material fact

with respect to fair equivalent value.  For the same reasons, there is a genuine dispute as to a material fact with respect to whether these transfers reduced the value of Allou's estate to the detriment of its creditors.

And finally, there is a genuine dispute as to a material fact with respect to whether UTA should receive a credit for funds that it repaid to Allou.  The determination whether to permit such a credit "is based on principles of equity that a court . . . may apply . . . with considerable discretion," and the application of those principles turns on whether UTA knowingly participated in the Jacobs' misconduct at Allou.  *Goldman Sachs Execution & Clearing, L.P. v. Official Unsecured Creditors' Comm. of Bayou Group, LLC*, --- F. Supp. 2d ---, 2010 WL 4877847, at *5 (S.D.N.Y. Nov. 30, 2010) (distinguishing cases that have granted credits from the case before it where the defendant was not "totally innocent of wrongdoing").  *See Nostalgia Network, Inc. v. Lockwood*, 315 F.3d 717, 720 (7th Cir. 2002) (finding with respect to a gratuitous transfer where there was evidence of actual fraud that "the fact that some or for that matter all of it may later have seeped back to the debtor does not legitimize the transfer").

Accordingly, based on the entire record, UTA's motion for partial summary judgment with respect to the Trustee's claims under the DCL on grounds that it made $380,000 in repayments is denied.

> *Whether UTA Is Entitled to Judgment with Respect to $2,724,630 in Transfers Involving Crystal Clear*

UTA seeks partial summary judgment on Claims Four through Seven with respect to indirect transfers from Crystal Clear, based on three arguments.  In total, the Trustee seeks $3,624,630 in connection with transfers from Crystal Clear.

<u>UTA Disputes that $1.3 Million in Funds Originated at Allou</u>  UTA argues that there is

59

no genuine dispute as to a material fact with respect to whether $1.3 million of the funds transferred from Crystal Clear to UTA originated at Allou. UTA also argues that the Trustee has not shown how the disputed $1.3 million can be traced to Allou.

The Trustee argues that there is a triable dispute of fact with respect to whether these funds originated at Allou based on the testimony of Crystal Clear's principal Abraham Lefkowitz that funds transferred from Allou to Crystal Clear were destined for UTA and Crystal Clear did not otherwise conduct business with Allou. The Trustee also cites the undisputed evidence that UTA received funds from Crystal Clear, and Crystal Clear acted as an intermediary for transfers from Allou to UTA.

"[A] plaintiff must carry its burden to establish that the funds at issue are property of the estate" but the plaintiff need not establish "dollar-for-dollar accounting of the exact funds at issue." *In re Allou Distribs., Inc.*, 379 B.R. at 30 (internal quotation marks omitted).

As explained by the Eleventh Circuit in similar circumstances:

> In an action seeking recovery, the plaintiff has the burden of tracing funds it claims to be property of the estate. . . . [But] it is also true that proper tracing does not require dollar-for-dollar accounting. The bankruptcy court determined that the Trustee successfully proved by a preponderance of the evidence that the $1.050 million transferred to [the defendant] from [intermediary] accounts, originated solely with [the debtor]. We cannot find that conclusion clearly erroneous. [The debtor's principal and its counsel] perpetrated a fraud that can only be described as massive. It is not fatal to the Trustee's case that dollar for dollar, the exact funds cannot be traced.

> The evidence demonstrates that the funds used to purchase the [] property originated in [the intermediary] accounts, and the monies in those accounts originated with the Debtor. [The debtor's principal and its counsel] cycled substantial amounts of money through nearly two dozen entities on a regular basis. During that time, [the debtor's] debt increased in lock-step with [the debtor's principal's] burgeoning treasure chest, all in an effort to hide assets from creditors. That money eventually found its way to [the defendants].

60

*IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs., Inc.)*, 408 F.3d 689, 708-09 (11th Cir. 2005) (internal citations omitted).

Here, the parties stipulate that Allou made thirteen transfers to Crystal Clear totaling more than $2.5 million, Crystal Clear made eighteen transfers to UTA totaling $3.4 million, UTA made 25 transfers to Crystal Clear totaling more than $4.6 million, and Crystal Clear made eight transfers to Allou totaling $1.9 million.  Abraham Lefkowitz testified that he was "not exactly sure" whether "every dollar that Allou gave to Crystal Clear end[ed] up going from Crystal Clear to the UTA . . . ."  Haddad Decl. Exh. 41 (Lefkowitz Tr. 34:23-35:2).  And Mr. Lefkowitz also testified that the transactions between Allou and Crystal Clear were "[l]oans that were given to Crystal Clear that [it] should give to UTA."  Haddad Decl. Exh. 41 (Lefkowitz Tr. 33:16-17).

These facts are sufficient to create a genuine dispute as to a material fact with respect to whether the $1.3 million originated at Allou.  Accordingly, based on the entire record, UTA's motion for partial summary judgment with respect to the Trustee's claims under the DCL to recover these transfers is denied.

UTA Argues that It Repaid $1.2 Million in Good Faith  UTA argues that there is no genuine dispute as to a material fact with respect to whether it repaid in good faith $1.2 million of the funds transferred to it from Crystal Clear.  UTA notes that the parties stipulate that between August 1997 and June 2002, UTA transferred $4,611,109 to Crystal Clear, and that $1.9 million was transferred from Crystal Clear to Allou.  And UTA argues that certain stipulated transfers from UTA to Crystal Clear correspond to stipulated transfers from Crystal Clear to Allou.  Specifically, between December 1997 and June 2000, on the same days that UTA made

61

transfers of $300,000, $200,000, $250,000, and $200,000 to Crystal Clear, Crystal Clear made transfers in the same amounts to Allou. UTA also points to a transfer made on August 27, 1999, from UTA to Crystal Clear in the amount of $250,000, and a corresponding transfer of that same amount from Crystal Clear to Allou on September 20, 1999.

In response, the Trustee argues that there are genuine disputes as to material facts precluding partial summary judgment with respect to UTA's good faith and as to whether these transfers reduced the value of Allou's estate to the detriment of its creditors.

Here too, as discussed in the context of the Plaintiffs' aiding and abetting claims, there are genuine disputes as to material facts with respect to whether UTA knowingly participated in the Jacobs' misconduct at Allou. These same issues are relevant to whether UTA acted in good faith and whether it had knowledge of the Jacobs' fraud when it made and received these transfers, and they preclude summary judgment. There is also a genuine dispute as to a material fact with respect to the other component of fair consideration, fair equivalent value. And there is a genuine dispute as to a material fact with respect to whether these transfers reduced the value of Allou's estate to the detriment of its creditors.

Accordingly, based on the entire record, UTA's motion for partial summary judgment with respect to the Trustee's claims under the DCL to recover these transfers is denied.

UTA Denies Receiving $224,630   UTA argues that there is no genuine dispute as to a material fact with respect to whether it received $224,630 in two transfers from Crystal Clear, one made on January 26, 2000, in the amount of $75,000, and another made on January 3, 2002, in the amount of $149,630. UTA contends that it has no record of receiving these transfers, and argues that the Trustee has not come forward with evidence sufficient to show that it did.

In response, the Trustee argues that the testimony of Abraham Lefkowitz shows that the funds that Allou transferred to Crystal Clear were then transferred by Crystal Clear to UTA.  In particular, the Trustee notes that Mr. Lefkowitz testified that the transactions between Allou and Crystal Clear were "[l]oans that were given to Crystal Clear that [it] should give to UTA." Haddad Decl. Exh. 41 (Lefkowitz Tr. 33:16-17).  And as noted above, the parties stipulate that Allou made thirteen transfers to Crystal Clear totaling more than $2.5 million, Crystal Clear made eighteen transfers to UTA totaling $3.4 million, UTA made 25 transfers to Crystal Clear totaling more than $4.6 million, and Crystal Clear made eight transfers to Allou totaling $1.9 million.  But the Trustee has not come forward with evidence of these transfers from Crystal Clear to UTA, including direct evidence in the form of checks, wire transfer records, or other deposit records, to create a genuine dispute as to a material fact with respect to whether UTA received transfers in this amount.

Here, based on the entire record, UTA has shown that there is no genuine dispute as to a material fact with respect to whether it received the $224,630 in transfers from Crystal Clear, and the Trustee has not come forward with evidence sufficient to show that Crystal Clear made transfers in this amount to UTA.  Accordingly, UTA's motion for partial summary judgment with respect to the Trustee's claims under the DCL to recover these transfers is granted.

*Whether UTA Is Entitled to Judgment with Respect to the Tereza Transfers*

UTA seeks partial summary judgment on Claims Four through Seven with respect to indirect transfers by Tereza, based on two arguments.  The Trustee seeks to avoid and recover two transfers by Tereza totaling $105,000, and UTA seeks judgment with respect to each transfer.

63

UTA Disputes that $100,000 Originated at Allou  UTA argues that there is no genuine dispute as to a material fact with respect to whether a $100,000 transfer that it received from Tereza originated at Allou.

The Trustee argues that there are triable disputes as to material facts precluding summary judgment based on evidence that from January 1997 to April 2003, Tereza and its affiliated companies received payments from Allou of more than $35 million.  And the Trustee notes that the $100,000 transfer from Tereza to UTA occurred in May 2000, the same month that Allou transferred $850,000 to Tereza.

UTA responds that the Trustee's evidence is insufficient to create a genuine dispute as to a material fact with respect to whether the $100,000 originated at Allou.  That evidence includes a Fleet Bank "Statement of Accounts" for Allou showing certain debits and credits, including an $850,000 debit in May 2000, with the handwritten notation "TEREZA" next to that entry. Haddad Decl. Exh. 36.  UTA argues that the account statement does not show to whom the payment was made and that the handwritten notation is hearsay.  And UTA contends Tereza's May 2000 account statement does not show that Tereza received the $850,000.

Here, the record includes evidence that over $35 million was transferred from Allou to Tereza and its affiliated companies.  *See* Haddad Decl. Exh. 37.  And it is not clear from the record that Tereza had only one bank account.  As such, based on the entire record, there is a genuine dispute as to a material fact with respect to whether the $100,000 transfer from Tereza to UTA originated at Allou.  Accordingly, UTA's motion for partial summary judgment with respect to the Trustee's claims under the DCL to recover this transfer is denied.

UTA Denies Receiving $5,000  UTA argues that there is no genuine dispute as to a

64

material fact with respect to whether it received a $5,000 transfer from Tereza in January 2001. UTA contends that it has no record of receiving these funds, and argues that the Trustee has not come forward with evidence sufficient to show that it did.  In response, the Trustee relies on the transactions between Allou and Tereza to argue that there is a genuine dispute as to a material fact with respect to whether UTA received the disputed transfer.  But the Trustee does not come forward with specific evidence concerning a $5,000 transfer from Tereza to UTA.

Here, based on the entire record, UTA has shown that there is no genuine dispute as to a material fact with respect to whether it received the $5,000 transfer, and the Trustee has not come forward with evidence sufficient to create a genuine dispute as to a material fact on this element of its claim.  Accordingly, UTA's motion for partial summary judgment with respect to the Trustee's claims under the DCL to recover this transfer is granted.

### Whether UTA Is Entitled to Judgment with Respect to the AMT Transfers

UTA argues that there is no genuine dispute as to a material fact concerning its repayment in good faith of the entire $650,000 it received in connection with the AMT transfers. The parties do not dispute that each of the corresponding transfers from Allou was ultimately repaid to it.  As described above in the context of UTA's repayment of other transfers, and based on the entire record, there are genuine disputes as to material fact with respect to UTA's good faith, its lack of knowledge, and fair equivalent value that preclude summary judgment.  There is also a genuine dispute as to a material fact with respect to whether Allou's estate was diminished to the detriment of creditors.

Accordingly, UTA's motion for partial summary judgment with respect to the Trustee's claims under the DCL to recover the AMT transfers is denied.

*Whether UTA Is Entitled to Judgment on the Trustee's Section 548(a)(1)(A) and (B)*
*Claims*

UTA seeks partial summary judgment with respect to Claims Eight and Nine brought by the Trustee under Bankruptcy Code Sections 548(a)(1)(A) and (B).  In total, the Trustee seeks $1,154,400 on these claims, representing $304,000 in direct transfers from Allou to UTA, and $850,400 in transfers from intermediaries to UTA.[17]  UTA seeks partial summary judgment with respect to the direct transfers, based on two arguments.

UTA Denies Receiving $4,000  UTA argues that there is no genuine dispute as to a material fact with respect to whether it received a $4,000 transfer from Allou in December 2002. UTA contends that it has no record of receiving these funds, and that the Trustee has not come forward with evidence sufficient to show that it did.  The Trustee points to a check payable to "UTA" that was deposited into the account of "United Talmudical Academy of Kiryas Joel, Inc." Haddad Decl. Exh. 34.  But as noted above with respect to the Trustee's DCL claims, the Trustee has not identified evidence indicating that this check was payable to or for the benefit of the defendant UTA.

Here, based on the entire record, UTA has shown that there is no genuine dispute as to a material fact with respect to whether it received the $4,000 transfer, and the Trustee has not come forward with sufficient evidence to create a genuine dispute as to a material fact on this element of its claim.  Accordingly, UTA's motion for partial summary judgment with respect to

---

[17]  The reach back period under Bankruptcy Code Sections 548(a) is shorter than the limitations period applicable to claims under the DCL.  The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 increased the Section 548 reach back period from one year to two years, but only for cases commenced after April 20, 2006.  Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, §§ 1402(1),1406(b)(2) (2005).  This case was filed in 2003, so the applicable reach back period for these claims is one year.

the Trustee's claims under the Bankruptcy Code to recover this transfer is granted.

UTA Argues that It Repaid $300,000 in Good Faith    UTA argues that there is no genuine dispute as to a material fact concerning whether it repaid in good faith $300,000 to Allou as part of the round-trip transaction.

As with its arguments in connection with the Trustee's DCL claims, UTA asserts that there is no genuine dispute as to a material fact with respect to whether it repaid the sums in good faith and provided value, which would serve as a defense under Bankruptcy Code Section 548(c). And UTA argues that the Trustee cannot maintain a claim under Section 548(a) because funds that are repaid do not diminish the estate to the detriment of creditors.

The Trustee argues that there are genuine disputes as to material facts with respect to UTA's good faith and the harm to Allou and its creditors that preclude judgment.

As described above in the context of the Trustee's DCL claims and UTA's repayment of other transfers, and based on the entire record, there are genuine disputes as to material facts concerning UTA's good faith, the value given in exchange, and whether these transfers diminished Allou's estate to the detriment of creditors.

Accordingly, UTA's motion for partial summary judgment with respect to the Trustee's claims under the Bankruptcy Code to recover this transfer is denied.

Claim Four – Attorneys' Fees Under DCL Section 276-a

In Claim Four, the Trustee seeks attorneys' fees under DCL Section 276-a, in addition to the avoidance of transfers under DCL Section 276.

DCL Section 276-a provides:

> In an action . . . brought by a creditor . . . [or] trustee in bankruptcy, . . . to set
> aside a conveyance by a debtor, where such conveyance is found to have been

> made by the debtor and received by the transferee with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, in which action . . . the creditor . . . [or] trustee in bankruptcy . . . shall recover judgment, the justice . . . presiding at the trial shall fix the reasonable attorney's fees of the creditor . . . [or] trustee in bankruptcy . . . in such action . . . and the creditor . . . [or] trustee in bankruptcy shall have judgment therefor against the debtor and the transferee who are defendants in addition to the other relief granted by the judgment.

DCL § 276-a.

Here, the relevant inquiry under DCL Section 276-a is whether Allou made transfers, and UTA received those transfers, with the actual intent to hinder, delay, or defraud either present or future creditors. *See In re Jacobs*, 394 B.R. at 670-71; *In re All Am. Petroleum Corp.*, 259 B.R. at 19 ("Under New York law, an award of attorneys' fees in a fraudulent conveyance action is not appropriate in the absence of a showing of actual intent on the part of the defendant."). Unlike the aiding and abetting claims brought by the Plaintiffs, actual intent under Section 276-a may be shown under a badges of fraud analysis. *See In re Jacobs*, 394 B.R. at 670-71.

UTA argues that the evidence does not show that it had "actual knowledge" of the fraud at Allou, and therefore summary judgment is warranted. UTA Mem. at 57. The Trustee argues that there is a genuine dispute as to a material fact with respect to UTA's actual knowledge of the fraud at Allou.

As discussed above in the context of the Plaintiffs' aiding and abetting claims, the Trustee has come forward with evidence sufficient to show that there is a genuine dispute as to material facts with respect to UTA's knowing participation in the fraud at Allou. This evidence includes the amount, number, and circumstances of transactions involving Allou and UTA, directly and through intermediaries, the role played by Victor Jacobs in placing Mr. Meisels in a position of authority at UTA, the support of both Victor Jacobs and Mr. Meisels for Rabbi

68

Zalman Teitelbaum in the contentious dispute over the selection of the successor to the Grand Rebbe, and Mr. Meisels' role at UTA and his involvement in many of the transactions at issue in this case. That same evidence creates a genuine dispute as to a material fact concerning whether UTA received transfers from Allou with the actual intent to hinder, delay, or defraud Allou's present or future creditors.

Accordingly, based on the entire record, UTA's motion for summary judgment with respect to the Trustee's claim for attorney's fees under DCL Section 276-a is denied.

<u>Claims Eighteen, Nineteen, and Twenty – Unjust Enrichment, Money Had and Received, and Conversion</u>

Congress brings Claims Eighteen, Nineteen, and Twenty under New York common law theories of unjust enrichment, money had and received, and conversion, to recover funds transferred directly and indirectly to UTA after it entered into the Loan and Security Agreement dated September 4, 2001. The amounts that Congress seeks to recover are the same as those sought by the Trustee to the extent that transfers occurred after September 4, 2001.

*Unjust Enrichment*

A claim for unjust enrichment under New York law "require[s] proof that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Briarpatch Ltd. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004), *cert. denied*, 544 U.S. 949 (2005). As the Second Circuit notes, "[t]he 'essence' of such a claim 'is that one party has received money or a benefit at the expense of another.'" *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (quoting *City of Syracuse v. R.A.C. Holding, Inc.*, 258 A.D.2d 905, 906 (N.Y. App. Div. 4th Dep't 1999)). "A person may be unjustly enriched not only where he receives money or

69

property, but also where he otherwise receives a benefit. . . . [such as] where his debt is satisfied or where he is saved expense or loss." *Blus Cross of Cent. N.Y., Inc. v. Wheeler*, 99 A.D.2d 995, 996 (N.Y. App. Div. 4th Dep't 1983).

Generally, the measure of damages in a case for unjust enrichment is the reasonable value of the benefit conferred on the defendant by the plaintiff. *See Manhattan Telecomms. Corp. v. Global NAPS, Inc.*, 2010 WL 1326095, at *4 (S.D.N.Y. Mar. 31, 2010) (citing *Giordano v. Thomson*, 564 F.3d 163, 170 (2d Cir. 2009)); *Mayer v. Bishop*, 158 A.D.2d 878, 881 (N.Y. App. Div. 3d Dep't) ("In situations where the defendant receives a benefit, but the plaintiff's loss is difficult to measure, proper restitution is the amount by which the defendant is enriched"), *appeal denied*, 76 N.Y.2d 704 (1990). Recovery under an unjust enrichment theory is "premised on the principle that recovery is to be had *ex aequo et bono*, according to what is equitable and good." *T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A.*, 2010 WL 4038826, at *4 (E.D.N.Y. Oct. 4, 2010). Because the claim is equitable in nature, courts consider factors such as whether the defendant still retains that benefit, whether the defendant's conduct was tortious or fraudulent, and whether there was a change in position by the defendant, in determining the extent of recovery. *See Paramount Film Distrib. Corp. v. State*, 30 N.Y.2d 415, 421 (1972) ("The essential inquiry in any action for unjust enrichment or restitution is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered"), *cert. denied*, 414 U.S. 829 (1973); *St. John's Univ. v. Bolton*, --- F. Supp. 2d. ---, 2010 WL 5093347, at *29 (E.D.N.Y. Dec. 10, 2010) (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Chipetine*, 221 A.D.2d 284, 286-87 (N.Y. App. Div. 1st Dep't 1995)); *Mayer*, 148 A.D.2d at 880 ("[T]o determine whether there has indeed been unjust enrichment the inquiry must focus on the

human setting involved, not merely upon the transaction in isolation") (internal quotation marks and citations omitted).

Finally, courts may reduce the amount of a claim for unjust enrichment based on repayment. *See Kleinman v. E.L. Tool & Die Co.*, 30 A.D.3d 1123, 1127 (N.Y. App. Div. 1st Dep't 2006). And a claim for unjust enrichment may be dismissed if the funds sought have been returned. *See Apollon Waterproofing & Restoration Corp. v. Bergassi*, 241 A.D.2d 347, 348 (N.Y. App. Div. 1st Dep't 1997) (affirming dismissal of unjust enrichment claim on summary judgment where defendants had returned the subject funds and "therefore did not retain any benefit unjustly").

### Money Had and Received

The elements of a claim for money had and received under New York law are (1) the defendant received money belonging to the plaintiff; (2) the defendant received a benefit from the receipt of the money; and (3) under principles of equity and good conscience, the defendant should not be permitted to keep the money. *See Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.*, 731 F.2d 112, 125 (2d Cir. 1984). A claim for money had and received "is an obligation which the law creates in the absence of agreement when one party possesses money that in equity and good conscience he ought not to retain and that belongs to another . . . ." *Parsa v. State*, 64 N.Y.2d 143, 148 (1984). "The action depends upon equitable principles in the sense that broad considerations of right, justice and morality apply to it, but it has long been considered an action at law." *Parsa*, 64 N.Y.2d at 148. As with a claim for unjust enrichment, this claim is premised on the principle that recovery is to be had according to what is equitable and good. *See T.D. Bank, N.A.*, 2010 WL 4038826, at *4. And the Court of Appeals of New

71

York has found that the damages available in a claim for money had and received are those necessary to make the plaintiff whole. *See Bd. of Educ. of Cold Spring Harbor Cent. Sch. Dist. v. Rettaliata*, 78 N.Y.2d 128, 140 (1991) (finding that "under any consideration of 'right, justice and morality' plaintiffs, in order to be made whole, should be permitted to assert a claim to recover any interest that may be due them") (quoting *Parsa*, 64 N.Y.2d at 148).

A plaintiff cannot state a claim for money had and received if the defendant did not receive the plaintiff's money. *See Bietola v. McCue*, 308 A.D.2d 416, 417 (N.Y. App. Div. 1st Dep't 2003). Courts may reduce the amount available to a plaintiff based on partial repayment. *See Kleinman*, 30 A.D.3d at 1127. And a cause of action for money had and received may be dismissed if the defendant returned the entirety of the funds sought by the plaintiff. *See Fesseha v. TD Waterhouse Investor Servs.*, 305 A.D.2d 268, 269 (N.Y. App. Div. 1st Dep't 2003) ("We note that even if there had been no contract between the parties providing for commissions in connection with liquidation sales, plaintiff's claim for money had and received would still have been properly dismissed since the commissions were returned to plaintiff.").

*Conversion*

Under New York law, the common law tort of conversion is the "unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights . . . ." *State v. Seventh Regiment Fund, Inc.*, 98 N.Y.2d 249, 259 (2002) (internal quotation marks omitted). The plaintiff must show that the defendant received and retained the plaintiff's goods in order to state a claim. *See, e.g.*, *In re Harley*, 293 A.D.2d 131, 139-40 (N.Y. App. Div. 1st Dep't 2001); *L.H.P. Realty Co. v. Rich*, 2001 WL 1537744, at *3 (Sup. Ct. N.Y. Co. Aug. 28, 2001). Good faith is not a defense in a conversion action. *See* 23

N.Y. Jur. 2d *Conversion* § 52 (2010).

Damages for conversion are usually the value of the property at the time of conversion, plus interest. *See Fantis Foods, Inc. v. Standard Importing Co.*, 49 N.Y.2d 317, 326 (1980). If funds are returned, the recovery available on a conversion claim may be reduced. *See Culinary Connection Holdings, Inc. v. Culinary Connection of Great Neck, Inc.*, 1 A.D.3d 558, 559 (N.Y. App. Div. 2d Dep't 2003). "Profits lost are generally disallowed, though they may be recoverable if they may reasonably be expected to follow from the conversion . . . ." *Fantis Foods, Inc.*, 49 N.Y.2d at 326 (internal citations omitted).

### *Whether UTA Is Entitled to Judgment with Respect to the Common Law Claims*

UTA seeks partial summary judgment on Claims Eighteen, Nineteen, and Twenty arguing that Congress may not recover damages for amounts that UTA did not receive or were repaid, because each of Congress' common law claims is premised on a defendant's unjustified retention of funds. In total, Congress seeks to recover $1,762,530, representing direct transactions totaling $322,000 and indirect transactions totaling $1,440,530. UTA seeks judgment as to $313,000 in direct transfers and $149,650 in transfers from Crystal Clear.

UTA Denies Receiving $13,100    UTA argues that there is no genuine dispute as to a material fact with respect to whether it received $13,100 in direct transfers from Allou after September 4, 2001. UTA denies that it received these funds, and argues that Congress has not come forward with evidence sufficient to show that it did. These transfers are included within the $31,900 in transfers discussed in connection with the Trustee's fraudulent transfer claims, and are comprised of transfers in the amounts of $2,000, $3,600, $2,500, $500, $500, and $4,000. As discussed above, the evidence presented by Congress with respect to these transfers

is insufficient to create a genuine dispute as to a material fact concerning UTA's receipt of $13,100.  And each of the common law claims requires that the defendant received the funds at issue.

Here, based on the entire record, UTA has shown that there is no genuine dispute as to a material fact with respect to whether it received the $13,100, and Congress has not come forward with evidence sufficient to create a genuine dispute as to a material fact concerning UTA's receipt of these funds.  Accordingly, UTA's motion for partial summary judgment with respect to Congress' claims under New York common law to recover these funds is granted.

UTA Argues that it Repaid $300,000  UTA argues that there is no genuine dispute as to a material fact concerning whether it repaid $300,000 to Allou in connection with the round-trip transaction.  Congress does not dispute that UTA repaid this amount, but argues that as a matter of equity and good conscience, UTA should not receive a credit for this repayment because it was involved in the Jacobs' fraudulent scheme.

Courts may weigh the equities of a case in considering the appropriate measure of damages on a claim for unjust enrichment or money had and received.  Here, as discussed above in connection with the Plaintiffs' aiding and abetting claims there are genuine disputes as to material facts concerning whether UTA was a knowing participant in the Jacobs' misconduct.  And there is a genuine dispute as to a material fact with respect to the benefit conferred upon UTA and the measure of damages necessary to make Congress whole with respect to these transfers.

But these equitable considerations do not have the same role in considering the appropriate measure of damages on a conversion claim.  As a result, based on the entire record,

74

UTA has shown that there is not a genuine dispute as to a material fact with respect to whether this repayment should be taken into account in fixing damages with respect to Congress' conversion claim, and Congress has not come forward with evidence sufficient to create a genuine dispute as to a material fact with respect to this matter.

Accordingly, based on the entire record, UTA's motion for partial summary judgment on grounds that it made $300,000 in repayments with respect to Congress' unjust enrichment and money had and received claims is denied and with respect to Congress' conversion claim is granted.

UTA Denies Receiving $149,650  UTA argues that there is no genuine dispute as to a material fact concerning whether it received a $149,650 transfer from Crystal Clear.  UTA contends that it has no record of receiving these transfers, and that Congress has not come forward with evidence sufficient to show that it did.

As discussed above in connection with UTA's request for partial summary judgment on the Trustee's DCL claims to recover two transfers from Crystal Clear totaling $224,630, the evidence presented with respect to this transfer, which was made after September 4, 2001, is insufficient to create a genuine dispute as to a material fact concerning UTA's receipt of it.  And each of the common law claims requires that the defendant receive the funds at issue.

Here, based on the entire record, UTA has shown that there is no genuine dispute as to a material fact with respect to whether it received $149,650 from Crystal Clear, and Congress has not come forward with sufficient evidence to create a genuine dispute as to a material fact concerning this element of its claims.  Accordingly, UTA's motion for partial summary judgment with respect to Congress' claims under New York common law to recover these funds

is granted.

## **Conclusion**

For the reasons stated herein, and based on the entire record, UTA's motion for partial

summary judgment is granted in part and denied in part as reflected in this Memorandum

Decision.  An order in conformity with this Memorandum Decision shall be entered

simultaneously herewith.

Dated: Brooklyn, New York
       March **_18_**, 2011

_**S/ Elizabeth S. Stong**_
HONORABLE ELIZABETH S. STONG
UNITED STATES BANKRUPTCY JUDGE